UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA,

                Plaintiff,

       - v. -

CHUCK CONNORS PERSON and
RASHAN MICHEL,

                Defendants.

17 Cr. 683 (LAP)

MEMORANDUM AND ORDER

LORETTA A. PRESKA, Senior United States District Judge:

    Defendants Chuck Connors Person ("Person") and Rashan
Michel ("Michel") are charged in a six-count Superseding
Indictment with a number of crimes in connection with an alleged
agreement to direct college basketball players to certain
service providers when the players turned professional.

    The Defendants moved to dismiss the Superseding Indictment
as both legally insufficient and constitutionally infirm. (See
Def. Chuck Connors Person's Mem. of Law in Supp. of His Mot. to
Dismiss the Indictment, ("Person Br."), dated Mar. 9, 2018 [dkt.
no. 46]; see Def. Rashan Michel's Mem. of Law in Supp. of Def.'s
Mot. to Dismiss the Indictment, ("Michel Br."), dated Mar. 30,
2018 [dkt. 55].) On April 30, 2018, the Government replied in a
Memorandum of Law in Opposition to Defendants' motions to
dismiss. (("Gov. Br.") [dkt. 60].) On May 31, 2018, the
Government filed a Superseding Indictment that dropped the wire

fraud conspiracy count against Michel and reformulated its theory of the wire fraud charge against Person. (Superseding Indictment ("Sup. Ind."), dated May 31, 2018 [dkt. 71.].) On July 27, 2018, Defendants submitted Reply Memoranda of Law. (("Michel Rep.") [dkt. 89]; ("Person Rep.") [dkt. 84].) On August 24, 2018, the Government submitted a sur-reply in opposition. (("Gov. Sur. Rep.") [dkt. 95].)

For the reasons stated below, Defendants' motions to dismiss the Superseding Indictment are denied.

I.   Background

A. The National Collegiate Athletic Association

The National Collegiate Athletic Association (the "NCAA") is a non-profit organization that regulates the athletics of over 1,000 colleges and universities. (Sup. Ind. ¶ 9.) NCAA member schools are organized into three separate divisions: Division I, II, and III. (Id.) Division I schools typically are the largest, have the biggest budgets, and offer the most athletic scholarships. (Id.) Auburn University (the "University") has a Division I basketball program. (Id. at ¶ 1.)

Division I schools are governed by the NCAA Division I Manual, which contains the NCAA Constitution and operating bylaws (the "Bylaws"). (Id. at ¶ 12.) The Bylaws govern a wide

range of behavior. For example, they prohibit the use of tobacco products by all game personnel during practice and competition. See, e.g., 2018-19 Division I Manual, Natl. Collegiate Athletic Assoc. (July 2018), http://www.ncaapublications.com/productdownloads/D119.pdf.

The NCAA says that one of its core principles is that of amateurism and that student-athletes "should be protected from exploitation by professional and commercial enterprises." (Sup. Ind. at ¶ 12.) The NCAA effects this stated principle by prohibiting student-athletes from receiving financial assistance from anyone other than the university or the student-athlete's family, unless the NCAA authorizes such payment. (Id. at ¶ 13.) Student-athletes are also prohibited from accepting any benefits from a financial advisor or an agent. (Id.)

In addition, coaches are prohibited from "representing[ing], directly or indirectly, any individual in the marketing of his or her athletics ability or reputation to an agent." (Id. at ¶ 16.) Coaches are also prohibited from arranging or facilitating a meeting between a student-athlete and an agent, financial advisor, or someone representing an agent or financial advisor. (Id.)

Student-athletes, coaches, and staff members are required to complete annual certifications regarding their knowledge of NCAA rules violations. (Id. at ¶ 17.) It is a violation of the

Bylaws knowingly to furnish or influence others to furnish the NCAA or the individual's institution false or misleading information about rules violations. (Id. at ¶ 20.)

Violations of the Bylaws could lead to penalties, including, but not limited to, limitations on a university's "participation in postseason play in the involved sport," "requirements that an institution pay a fine, return revenue received from a specific athletics event or series of events, or . . . reduction[s] in or elimination of monetary distribution by" the NCAA, "limitations on the number of financial aid awards that may be provided" by the university to student-athletes, and "recruiting restrictions including on the ability to conduct off-campus recruiting activities or to communicate by telephone or letter with prospective student-athletes." (Id. at ¶ 22.)

B. The Alleged Scheme

Defendants are charged in a six-count Superseding Indictment alleging that Person, a coach for the University's basketball team, solicited and was paid bribes facilitated by Michel. (See Sup. Ind. ¶ 1.) In exchange for these bribes, Person is alleged to have agreed to exert his influence over student-athletes to guide them to retain the services of the payors once the athletes turned professional. (See id.) These payments were made in violation of the NCAA's rules. (See id. at ¶ 4.) These actions are alleged to have exposed the

4

University to the risk of "significant fines and penalties."
(Id. at ¶ 4.)  Payment of Person's salary is alleged to have
been made under false pretenses and material misrepresentations.
(See id. at ¶¶ 4, 23-26.)  Defendants are alleged to have
defrauded the University of the right to control its assets,
namely a limited number of coaching positions.  (See id. at
¶ 4.)

Count One charges a conspiracy to commit bribery in
violation of 18 U.S.C. § 371 as follows:

> From at least in or about September 2016, up to
> and including in or about September 2017, in the
> Southern District of New York and elsewhere, CHUCK
> CONNORS PERSON and RASHAN MICHEL, the defendants,
> and others known and unknown, willfully and
> knowingly did combine, conspire, confederate, and
> agree together and with each other to commit
> offenses against the United States, to wit,
> violations of Title 18, United States Code, Sections
> 666(a)(1)(B) and 666(a)(2).
>
> It was a part and object of the conspiracy that
> CHUCK CONNORS PERSON, the defendant, being an agent
> of an organization that received, in a one-year
> period, benefits in excess of $10,000 under a
> Federal program involving a grant, contract,
> subsidy, loan, guarantee, insurance, and other form
> of Federal assistance, to wit, Auburn University,
> corruptly would and did solicit and demand for the
> benefit of a person, and accept and agree to accept,
> something of value from CW-1, intending to be
> influenced and rewarded in connection with a
> business, transaction, and series of transactions of
> such organization, involving something of value of
> $5,000 and more, in violation of Title 18, United
> States Code, Section 666(a)(1)(B).
>
> It was further a part and an object of the
> conspiracy that RASHAN MICHEL, the defendant, and
> others known and unknown, corruptly would and did
> give, offer, and agree to give something of value to

a person, with intent to influence and reward an agent of an organization, in connection with business, transactions, and series of transactions of such organization involving a thing of value of $5,000 and more, while such organization was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, in violation of Title 18, United States Code, Section 666(a)(2).

### Overt Acts

On or about November 29, 2016, in Alabama, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and CW-1 met, during which meeting PERSON agreed to accept approximately $50,000 in bribe payments from CW-1 in exchange for using his official position at Auburn University to steer student-athletes on Auburn University's NCAA Division I men's basketball team to retain the services of CW-1 and MICHEL.

On or about December 12, 2016, in Manhattan, New York, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, met with CW-1 and a student-athlete who, at that time, was a member of Auburn University's NCAA Division I men's basketball team and together discussed, in sum and substance, that the athlete would retain the services of MICHEL and CW-1 upon becoming a professional basketball player.

Immediately after the December 12, 2016 meeting, in Manhattan, PERSON took from CW-1 a $15,000 cash bribe.

(Title 18, United States Code, Section 371.)

(Id. at ¶¶ 41-44.)

Count Two charges solicitation of bribes and gratuities by an agent of a federally funded organization in violation of 18 U.S.C. § 666 as follows:

From at least in or about September 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, CHUCK CONNORS PERSON, the defendant, being an agent of an organization that received, in a one-year period,

6

benefits in excess of $10,000 under a Federal
program involving a grant, contract, subsidy, loan,
guarantee, insurance, and other form of Federal
assistance, to wit, Auburn University, aided and
abetted by RASHAN MICHEL, the defendant, corruptly
solicited and demanded for the benefit of a person,
and accepted and agreed to accept, a thing of value
from a person, intending to be influenced and
rewarded in connection with a business, transaction,
and series of transactions of such organization
involving a thing of value of $5,000 and more, to
wit, PERSON, in his capacity  as a coach for the
NCAA Division I men's basketball  team at Auburn
University, solicited and accepted cash and things
of value from CW-1, as brokered by MICHEL, which
were intended to influence and reward PERSON in
connection with the business of Auburn University.
(Title 18, United States Code, Section 666.)

(Id. at ¶ 47.)

Count Three charges a conspiracy to commit honest services

wire fraud in violation of 18 U.S.C. §§ 1343, 1346, and 1349

as follows:

From at least in or about September 2016, up to
and including in or about September 2017, in the
Southern District of New York and elsewhere, CHUCK
CONNORS PERSON and RASHAN MICHEL, the defendants,
and others known and unknown, willfully and
knowingly did combine, conspire, confederate, and
agree together and with each other to commit honest
services wire fraud in violation of Title 18, United
States Code, Sections 1343 and 1346.
It was a part and an object of the conspiracy that
CHUCK CONNORS PERSON and RASHAN MICHEL, the
defendants, and others known and unknown, willfully
and knowingly, having devised and intending to
devise a scheme and artifice to defraud, and to
deprive Auburn University of its intangible right to
PERSON'S honest services, would and did transmit and
cause to be transmitted by means of wire
communication in interstate and foreign commerce.,
writings, signs, signals, pictures, and sounds for
the purpose of executing such scheme and artifice,

in violation of Title 18, United States Code, Sections 1343 and 1346, to wit, PERSON, through telephone and email communications, and wire transfers of funds, among other means and methods, agreed to and did deprive Auburn University of PERSON'S honest services by soliciting and receiving bribes, some of which were facilitated by MICHEL, in exchange for which PERSON agreed to and did exercise his influence as a coach at Auburn University to persuade and pressure student-athletes to retain the services of CW-1.
(Title 18, United States Code, Section 1349.)

(Id. at ¶¶ 48-50.)

Count Four charges honest services wire fraud in violation of 18 U.S.C. §§ 1343, 1346, 1349, and 2 as follows:

From at least in or about September 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, CHUCK CONNORS PERSON, the defendant, aided and abetted by RASHAN MICHEL, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive Auburn University of its intangible rights to PERSON'S honest services, and attempting to do so, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, PERSON, through telephone and email communications, and wire transfers of funds, among other means, agreed to and did deprive Auburn University of his honest services by soliciting and receiving bribes, some of which were facilitated by MICHEL, in exchange for which PERSON agreed to and did exercise his influence as a coach at Auburn University to persuade and pressure student-athletes to retain the services of CW-1.
(Title 18, United States Code, Sections 1343, 1346, 1349, and 2.)

(Id. at ¶ 52.)

Count Five charges wire fraud in violation of 18 U.S.C.

§ 1343 and 2 as follows:

> From at least in or about September 2016, up to
> and including in or about September 2017, in the
> Southern District of New York and elsewhere, CHUCK
> CONNORS PERSON, the defendant, willfully and
> knowingly, having devised and intending to devise a
> scheme and artifice to defraud, and for obtaining
> money and property by means of false and fraudulent
> pretenses, representations, and promises, did
> transmit and cause to be transmitted by means of
> wire and radio communication in interstate and
> foreign commerce, writings, signs, signals,
> pictures, and sounds for the purpose of executing
> such scheme and artifice, to wit, PERSON
> participated in a scheme to defraud, by telephone,
> email, and wire transfers of funds, among other
> means and methods, Auburn University by making
> material misrepresentations to Auburn University,
> including in written agreements and certification
> forms submitted to Auburn University, that concealed
> the existence of bribe payments that PERSON had
> received in violation of NCAA rules and PERSON'S
> duties to Auburn University, based on which Auburn
> University provided salary payments to PERSON, and
> further depriving Auburn University of the right to
> control the use of its assets, including, but not
> limited to, the decision of how to allocate a
> limited number of coaching staff positions, and
> further exposing Auburn University to tangible
> economic harm, including monetary and other
> penalties imposed by the NCAA.
> (Title 18, United States Code, Sections 1343 and 2.)

(Id. at ¶ 54.)

Count Six charges Travel Act conspiracy in violation of

18 U.S.C. § 1952 as follows:

> From at least in or about September 2016, up to
> and including in or about September 2017, in the
> Southern District of New York and elsewhere, CHUCK
> CONNORS PERSON and RASHAN MICHEL, the defendants,

and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, a violation of Title 18, United States Code, Section 1952.57.

It was a part and object of the conspiracy that CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and others known and unknown, willfully and knowingly would and did travel in interstate commerce, and use and cause to be used the mail and facilities in interstate and foreign commerce, with the intent to distribute the proceeds of an unlawful activity, and to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, to wit, as part of MICHEL offering, and PERSON accepting commercial bribes, in violation of Alabama Criminal Code §§ 13A-11-120 and 13A-11-121, MICHEL and PERSON thereafter would and did perform and attempt to perform an act to distribute the proceeds of said unlawful activity, and to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(1) and (a)(3).

In furtherance of this conspiracy, and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

On or about November 29, 2016, in Alabama, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, and CW-1 met, during which meeting PERSON agreed to accept approximately $50,000 in bribe payments from CW-1 in exchange for using his official position at Auburn University to steer student-athletes on Auburn University's NCAA Division I men's basketball team to retain the services of CW-1 and MICHEL.

On or about December 12, 2016, in Manhattan, New York, CHUCK CONNORS PERSON and RASHAN MICHEL, the defendants, met with CW-1 and a student-athlete who, at that time, was a member of Auburn University's NCAA Division I men's basketball team and together discussed, in sum and substance, that

the athlete would retain the services of MICHEL
and CW-1 upon becoming a professional basketball
player.
        Immediately after the December 12, 2016
meeting, in Manhattan, PERSON took from CW-1 a
$15,000 cash bribe.
(Title 18, United States Code, Section 371).

(Id. at ¶¶ 55-58.)

II. Legal Standard

Defendants argue that the Superseding Indictment is both

legally insufficient and constitutionally infirm for

vagueness and overbreadth.

On the former, Defendants argue the Superseding

Indictment fails to allege valid wire fraud, honest services

fraud, and Travel Act charges. Defendants also argue the

Superseding Indictment fails to allege Person was an agent of

the University and fails to allege that he breached an

official or public duty, both necessary elements for a

federal bribery charge. (Person Br. at 11; Michel Br. at

18.) Defendant Person argues that the Superseding

Indictment's new theory of wire fraud against him is

deficient as a matter of law. (Person Rep. at 3)

On the constitutional issues, Defendants argue that

Section 666 is unconstitutional both facially and as-applied.

Specifically, Defendants argue McDonnell v. United States,

136 S. Ct. 2355 (2016), narrowed the requirements of the

federal bribery statute, and, to the extent the Supreme Court

did not, Section 666 is unconstitutional.  (Michel Br. at 6-9.)

Notably, Defendants claim that the Superseding Indictment's new theory of wire fraud is constitutionally suspect as it makes a federal crime out of any unreported violation of the NCAA's rules.  (Person Br. at 4-6.)  This might be termed the "Handbook horrible."  Compare with Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 615 (2012) (Ginsburg, J.) ("One could call this concern 'the broccoli horrible.'  Congress, THE CHIEF JUSTICE posits, might adopt such a mandate, reasoning that an individual's failure to eat a healthy diet, like the failure to purchase health insurance, imposes costs on others.")

For the following reasons, the Defendants' motions to dismiss are denied.

### A. Dismissal of an Indictment

Under the Federal Rules of Criminal Procedure, an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and must include the "statute, rule, regulation, or other provision of law that the defendant is alleged to have violated."  FED. R. CRIM. P. 7(c)(1).  To fulfill this requirement, the Court of Appeals has "often stated that an indictment need do little more than to track the language of the

statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992) (internal quotation marks omitted). "An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." United States v. Yannotti, 541 F.3d 112, 127 (2d Cir. 2008) (internal quotation marks omitted).

"The sufficiency of an indictment and the interpretation of a federal statute are both matters of law" to be decided by the Court. United States v. Aleynikov, 676 F.3d 71, 76 (2d Cir. 2012). In making such determinations, "courts must take all allegations in the indictment as true." Id.; see Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 343 n.16 (1952); United States v. Goldberg, 756 F.2d 949, 950 (2d Cir. 1985). Moreover, courts "must read the indictment 'to include facts which are necessarily implied by the specific allegations made.'" United States v. Wedd, No. 15-cr-616, 2017 WL 3278923, at *1 (S.D.N.Y. July 31, 2017) (quoting United States v. Rigas, 490 F.3d 208, 229 (2d Cir. 2007) (citing United States v. Budovsky, No. 13-CR-368 DLC, 2015 WL 5602853, at *3 (S.D.N.Y. Sept. 23, 2015).

## B. Vagueness Doctrine

The Fifth Amendment to the Constitution of the United States provides that "[n]o person shall . . . be deprived of life, liberty, or property without due process of law." U.S. CONST. amend. V. "The vagueness doctrine is a component of the right to due process." Farrell v. Burke, 449 F.3d 470, 485 (2d Cir. 2006). A criminal statute "is impermissibly vague under the Due Process Clause of the Fifth Amendment" when (1) "the statute . . . fails to provide a person of ordinary intelligence fair notice of what is prohibited" or (2) "is so standardless that it authorizes or encourages seriously discriminatory enforcement." Holder v. Humanitarian Law Project, 561 U.S. 1, 18 (2010) (internal quotation marks omitted).

Regarding the fair notice prong of the vagueness doctrine:

[A] court must ask whether the law presents an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited and proscribed, not whether a particular plaintiff actually received a warning that alerted him or her to the danger of being held to account for the behavior in question.

United States v. Smith, 985 F. Supp. 2d 547, 587 (S.D.N.Y. 2014), aff'd sub nom. United States v. Halloran, 664 F. App'x 23 (2d Cir. 2016) (citing Dickerson v. Napolitano, 604 F.3d 732, 745-46 (2d Cir. 2010) (internal quotation marks omitted)). "The standard is an objective one." Dickerson, 604 F.3d at 745.

Moreover, "the unavoidable ambiguities of language do not transform every circumstance in which judicial construction is necessary into a violation of the fair notice requirement." Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d 149, 159 (2d Cir. 2009). "Many statutes will have some inherent vagueness, for in most English words and phrases there lurk uncertainties." United States v. Herrera, 584 F.2d 1137, 1149 (2d Cir. 1978) (internal quotation marks omitted).

"As to the second prong of the vagueness test, regarding discriminatory enforcement, a statute will be struck down on this ground if it provides virtually unlimited or unfettered discretion to those who enforce it." Smith, 985 F. Supp. 2d at 589 (internal quotation marks omitted).

III. Discussion

A. The Superseding Indictment is Facially Valid

The Superseding Indictment is facially valid. Taken as true, it alleges a detailed series of acts whereby Defendants engaged in a scheme of federal bribery, honest services wire fraud, wire fraud, and Travel Act conspiracy. (See Sup. Ind. ¶¶ 41-44, 46-47, 48-50, 51-52, 53-54, 55-57.) The Superseding Indictment "track[s] the language of the statute charged" and provides the "time and place of the alleged crime" for all six counts. United States v. Stavroulakis, 952 F.2d 686, 693 (2d

15

Cir. 1992) (internal citations and quotation marks omitted); see
Sup. Ind. ¶¶ 41-44 (outlining Count One); ¶¶ 46-47 (outlining
Count Two); ¶¶ 48-50 (outlining Count Three); ¶¶ 51-52
(outlining Count Four); ¶¶ 53-54 (outlining Count Five); ¶¶ 55-
57 (outlining Count Six).

Moreover, the allegations in the Superseding Indictment
"convey[] sufficiently definite warning as to the proscribed
conduct when measured by common understanding and practices"
such that Defendants could plead double jeopardy in a later
prosecution based on the same conduct. United States v.
Coppola, 671 F.3d 220, 235 (2d Cir. 2012) (internal quotation
marks omitted). The Superseding Indictment includes a detailed
account of the conduct that forms the basis of the alleged
conspiracy, i.e., transactions where money was given in exchange
for Person's use of influence over the student-athletes. There
is not a mere recapitulation of the language of the statute, but
instead there are detailed allegations of Person and Michel's
acts and omissions, including alleged false statements made and
the alleged harm cause by those statements.

The facts in the Superseding Indictment are sufficient to
inform Defendants of the crimes charged and allow them to
prepare a defense. See, e.g., United States v. Faison, 393 Fed.
Appx. 754, 757 (2d Cir. 2010) (summary order) (internal
quotation marks omitted) (affirming the district court's denial

of a motion to dismiss the indictment because "the indictment .
. . track[ed] the language of [the statute] . . . [and] stated
adequately the object of the conspiracy—possessing cocaine with
intent to distribute it.")  The Government has also presented a
32-page criminal complaint laying out the alleged scheme in even
more detail.  (Complaint, dated Sep. 25, 2017 [dkt. no. 1].)

For these reasons, all of the counts of the Superseding
Indictment are facially valid.

The Court will, however, address two arguments advanced by
Defendants arguing against the sufficiency of the allegations in
the Superseding Indictment.  The first is with respect to the
federal bribery and honest services fraud charges where
Defendants argue Person was not acting as an agent or fiduciary
of the University.  (Person Br. at 2.)  The second is with
respect to the wire fraud charge against Person alone and
whether the crime was properly alleged.

i.    Agency and Fiduciary Duty

On the question of agency with respect to the federal
bribery statute, the statute requires a defendant be an "agent"
of the organization receiving federal funds.  18 U.S.C.
§ 666(a)(1).  Defendants argue that the Superseding Indictment's
allegation that Person agreed to accept a bribe in exchange for
"using his official position at Auburn University to steer
students" is the sole allegation and it relies on too broad a

conception of agency. (Person Br. at 11). Defendants argue that the Superseding Indictment "fails to allege that Mr. Person was acting within the scope of his agency" when he is alleged to have to have impermissibly exerted his influence. (Id. at 12.)

Section 666's statutory definition of agency is broader than its common law meaning. Compare 18 U.S.C. § 666(d)(1) ("[T]he term 'agent' means a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative") with RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006) ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."); see also United States v. Lupton, 620 F.3d 790, 800-01 (7th Cir. 2010) (holding it is possible for an individual to be an agent under Section 666, but not under a definition at common law). Section 666 explicitly includes employees as agents of an organization. 18 U.S.C. § 666(d)(1). The Superseding Indictment alleges that under the statute, Person was an employee and therefore an agent of an organization receiving federal funds. (Sup. Ind. at ¶ 5, 6). This is enough to meet Rule 7's requirements.

Defendants argue the Travel Act conspiracy charges should be dismissed because the Alabama statute underlying the conspiracy has a similar element to Section 666 and suffers from the same constitutional vagueness concerns. (Michel Br. at 34). They argue that the Alabama statute is even more vague and broad than Section 666 and that "an ordinary person could not be expected to discern whether Auburn University's 'affairs' would include the decision of an individual Auburn student to enter into an agreement with a financial advisor in the event that the student pursues a professional basketball career after leaving Auburn University." (Id. at 35).

The state statute requires "an agreement or understanding that the benefit will improperly influence [the bribe payee's] conduct in relation to his employer's or principal's affairs." ALABAMA CRIMINAL CODE 13-A-11-121 (2017). The Superseding Indictment alleges that Person used his official position at the University to influence student-athletes improperly. (Sup. Ind. ¶ 27.) This allegation, which must be taken as true, sufficiently alleges that Person's actions were taken in relation to the University's affairs. Thus, the Court rejects Defendants' challenge to the Travel Act conspiracy count.

On the fiduciary duty question for the honest services fraud charge, the Supreme Court has said that the "solid core" of honest services wire fraud cases "involv[e] offenders who, in

violation of a fiduciary duty, participated in bribery or kickback schemes." Skilling v. United States, 561 U.S. 358, 407 (2010). Defendants argue that "it is far from clear that Mr. Person was a fiduciary to Auburn," and that, even if he was, "the Indictment fails to allege facts supporting the theory that Mr. Person was acting within the scope of that duty when he recommended financial advisors to the players." (Person Br. at 14-15.) In so arguing, Defendant Person cites United States v. deVegter, 198 F.3d 1324 (11th Cir. 1999), where the Eleventh Circuit held that:

> [F]or a private sector defendant to have violated the victim's right to honest services, it is not enough to prove the defendant's breach of loyalty alone. Rather, as is always true in a breach of loyalty by a public official, the breach of loyalty by a private sector defendant must in each case contravene—by inherently harming—the purpose of the parties' relationship.

198 F.3d at 1328-29 (emphasis added)

The Government correctly points out that while it is true the University is not in the business of making professional service recommendations, "it is certainly in the business of running an NCAA compliant athletics program." (Gov. Br. at 16.) Assistance in running an NCAA-complaint program was a purpose of defendant Person's employment with the University, and this purpose would be contravened when a student-athlete was "rendered 'ineligible' to participate in Division I sports if the athlete was recruited by a university or any 'representative

of its athletics interest' in violation of NCAA rules." (Sup.
Ind. at ¶ 15.) It is a factual question whether this duty to
help run an NCAA-compliant athletics program was breached, and
thus that issue is not an appropriate basis for dismissal.

Defendants also rely on United States v. Rybicki, 354 F.3d
124 (2d Cir. 2013), for the proposition that honest services
fraud requires a "business relationship between the bribor and
the employer." (Person Br. at 19.) Defendants point out that
the alleged bribor in this case was not seeking to obtain any
benefit from a relationship between himself and the employer.
(Id. at 20.) In Rybicki, the Court of Appeals was not, however,
announcing a new requirement for honest services fraud when it
discussed "the bribery and kickback cases;" the court was simply
referring to a series of applicable cases. Rybicki, 354 F.3d at
139. Because no requirement was articulated, as a matter of
law, Defendants' argument is without merit.

Defendant Person makes a similar argument with respect to
Section 666. He argues that he was not acting "in connection
with any business, transaction, or series of transactions" of
the University. United States v. Whitfield, 590 F.3d 325, 346
(5th Cir. 2009). This Court rejects this argument for similar
reasons as above, namely, that running an NCAA-compliant program
was a business of the University, and Person's alleged scheme
was in connection with this business.

ii.  Person Wire Fraud Charge

Count Five of the Superseding Indictment charges Person with wire fraud under Section 1343.  (Sup. Ind. ¶¶ 53-54.)  In the original Indictment, both Person and Michel were charged with wire fraud on the theory that the University was deprived of scholarship money and the right to control the use of its assets.  (Ind. ¶¶ 46-49.)

The Superseding Indictment charges Person alone with wire fraud on a new theory.  (Sup. Ind. ¶¶ 53-54.)  The new theory is that Person made material misrepresentations to the University constituting a scheme to defraud.  Person is alleged to have deprived the University of the right to control the use of its assets, including how to allocate a limited number of coaching positions, as well as exposing the University to economic harm, including penalties from the NCAA.  (Sup. Ind. at ¶ 54.)

The wire fraud statue, in relevant part reads:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

Person advances a number of arguments for dismissal under this new theory wire fraud theory.

First, he relies on this Court's decision in United States v. Davis, No. 13-CR-923 (LAP), 2017 WL 3328240 (S.D.N.Y. Aug. 3, 2017), appeal withdrawn, No. 17-3190, 2017 WL 6803303 (2d Cir. Dec. 7, 2017). In Davis, the defendant was a subcontractor charged with wire fraud after making misrepresentations with respect to his compliance with the Port Authority's minority-owned and woman-owned business enterprise guidelines and policies. Id. at *5. It was stipulated that these guidelines and policies were not criminal laws. Id. at *3.

In evaluating the wire fraud charge in right to control cases, this Court asked whether the non-compliance "was an essential element of the contract[]," noting "it appears that convictions have been upheld where the deceit had the potential to cause economic harm to the victim or where it involved a violation of the law." Id. at *9. These are two central inquiries that this Court must conduct.

In Davis, this Court found that the misrepresentations did not go to an essential element of the contract -- the Port Authority contracted for steel in a 110-story building, and it received just that. Id. at *16. Furthermore, this Court found in Davis that Defendants' misrepresentations did not expose the

Port Authority to potential or actual economic harm or an undisclosed economic risk. Id.

Person points to the fact that in Davis, the jury was instructed that on a wire fraud charge, "To act with intent to defraud means to act knowingly and with the specific purpose of causing some financial harm or deprivation of property to the [victim]. The Government need not prove that the intended victim was actually harmed, only that such harm was contemplated." Transcript of Proceedings at 1135, United States v. Davis, No. 13 Cr. 923, dkt. no. 88 (S.D.N.Y. Aug. 10, 2016). Person asserts that the alleged harm to the University was, at most, an "inadvertent consequence" of the charged scheme. (Person Rep. at 3 (citing United States v. Regan, 713 F. Supp. 629, 637 (S.D.N.Y. 1989)).) He argues that the specific purpose of the alleged scheme was not to secure employment or a salary but rather to retain new clients when student-athletes became professional athletes.

Second, Person argues that a breach of contract does not, in and of itself, constitute wire fraud. (Person Rep. at 4.)

Finally, he argues that such a broad definition of wire fraud with respect to employment agreements would violate due process by turning every undisclosed NCAA rules violation into a potential federal crime - the aforementioned "Handbook horrible".

The Government responds that the misrepresentations were not incidental but necessary to ensure Person's continued employment with the University. (Gov. Sur. Rep. at 3.) It argues that Person's activities exposed the University to multiple forms of harm "depriving [it] of the right to control the use of its assets, including, but not limited to, the decision of how to allocate a limited number of coaching staff positions, and further exposing [it] to tangible economic harm, including monetary and other penalties imposed by the NCAA." (Sup. Ind. at ¶ 54.) The Government argues that these are factual questions for a jury, not to be decided on a motion to dismiss. (Id. at 4)

The Government responds to the "Handbook horrible" by pointing out there is a materiality and intent requirement that must be established by the Government. The Government "would be hard-pressed to convince a grand jury, let alone prove at trial" that a violation of the NCAA's prohibition on tobacco usage during practice and competition, for instance, had intentionally deprived the University of information that would expose it to economic harm. (Gov. Sur. Rep. at 6.)

The motion to dismiss the wire fraud charge is denied.

The alleged misrepresentation in this instance went directly to the essence of the bargain that the University had with Person -- his contract with the University to run a NCAA-

compliant basketball program.  That makes this case distinct from <u>Davis</u> in numerous ways. For one, there were misrepresentations made by Person as to the nature of the service that he was providing – he omitted informing the University of his additional service of providing financial and sartorial service provider recommendations through the use of his influence – a disclosure that would have put the University out of compliance with NCAA rules and made the recipient players ineligible to play.  <u>Compare with</u> <u>United States v. Davis</u>, No. 13-CR-923 (LAP), 2017 WL 3328240, at *15 (S.D.N.Y. Aug. 3, 2017), <u>appeal withdrawn</u>, No. 17-3190, 2017 WL 6803303 (2d Cir. Dec. 7, 2017).  These misrepresentations went to an essential element of Person's employment with the University – running an NCAA-compliant program.

There is also an alleged exposure of the University to potential economic harm from Person's misrepresentations, including NCAA penalties and fines.  In contrast, the misrepresentation in <u>Davis</u> went to an element of the contract that the general manager of the Office of Business Diversity and Civil Rights at the Port Authority said was only "aspirational." <u>Compare with</u> <u>id.</u> at *16.

There are also tangible economic harms alleged by the Government and subject to proof at trial.  That distinguishes

this case from both <u>McDonnell</u> and <u>Walters</u>, both relied on by Defendants.

In <u>United States v. Walters</u>, 997 F.2d 1219, 1225 (7th Cir. 1993), the Seventh Circuit reversed a mail fraud conviction of a defendant who signed contracts with student-athletes, violating the NCAA's rules. The Government's theory did not hinge on the fines in that case but rather on the opportunity cost of scholarship money that could have been directed elsewhere had the fraud not been perpetrated. 997 F.2d at 1224. The Court of Appeals described <u>Walters</u> as holding "without a showing of the defendant's intent to obtain money or property from the universities or the NCAA, the necessary connection between his actions and his victims' property was too attenuated to establish mail fraud." <u>United States v. Males</u>, 459 F.3d 154, 159 (2d Cir. 2006). This case is distinguishable from <u>Walters</u> because there was a direct relationship between Person and the University, and his actions are alleged to have directly exposed the University to economic harm.

The instant case is also distinguishable from <u>McDonnell</u> and Defendants' concern over a similar "standardless sweep." 136 S.Ct. at 2373. Unlike that case, the alleged behavior in question actually violates a contract. <u>Id.</u> at 2365-66. In <u>McDonnell</u>, the behavior, <u>i.e.</u>, a politician's responding to constituents, was protected by the First Amendment and was

outside the bounds of an "official act" as defined by the statute as interpreted by the Supreme Court. Here, the Defendants' alleged breaches of duty and material misrepresentations are not constitutionally protected.

In response to the "Handbook horrible", the Court of Appeals has said that materiality is a requirement of the misrepresentation in wire fraud cases. United States v. Weaver, 860 F.3d 90, 94 (2d Cir. 2017). Therefore it is not prosecutorial discretion alone that is relied on to avoid making any random bylaw violation a federal felony. This question of materiality becomes a factual question for the jury not to be determined at this stage.

For the above reasons, the motion to dismiss the wire fraud count against Person is denied.

Accordingly, for the reasons stated above, Rule 7's pleading requirements are satisfied, and the Superseding Indictment is facially valid.

> B. The Statute and the Allegations in the Superseding Indictment are not Unconstitutionally Vague

Defendants argue that the honest services fraud statute and federal bribery statute are unconstitutional both facially and as-applied in this case. (Michel Br. at 6-18, Person Br. at 16-20.) They rely primarily on McDonnell v. United States, which

narrowed the "official act" requirement in a separate federal bribery statute, Section 201. 136 S. Ct. at 2367-72.

Both the Supreme Court and the Court of Appeals have held that the honest services statute is not unconstitutionally vague. See id. at 2375; see United States v. Halloran, 664 F. App'x 23, 26 (2d Cir. 2016), cert. denied sub nom. Tabone v. United States, 137 S. Ct. 1361 (2017). The Supreme Court declined to find the statute vague because of its narrowed interpretation of the term "official act" in Section 201(a)(3). McDonnell, 136 S. Ct. at 2375.

The Court of Appeals has foreclosed Defendants' argument with respect to the federal bribery statute when it held that the McDonnell standard does not apply to Section 666 counts. United States v. Boyland, 862 F.3d 279, 291 (2d Cir. 2017), cert. denied, 138 S. Ct. 938 (2018). In Boyland, the Court of Appeals held that Section 666 was intended to cover more expansive behavior than Section 201. Id. That ruling was relied on by this Court in United States v. Percoco, 2017 WL 6314146, *4 (S.D.N.Y. Dec. 11, 2017), where Section 666 was held not to be unconstitutionally vague.

Defendant responds that this particular constitutional issue was not fully briefed by the parties in Boyland. (Michel Br. at 13 n.5.) However, assessing whether the McDonnell standard applied to Section 666 counts was a material issue for

the Boyland Court, and its conclusion cannot be dismissed as dicta. See Boyland, 862 F.3d at 289-91. This Court is not aware of any precedent, and Defendants cite none, standing for the proposition that district courts can ignore the holdings of higher courts if the issues covered by the holdings were not fully briefed by the parties.

For the above reasons, the Court rejects Defendants' constitutional vagueness arguments.

IV.  Conclusion

For the reasons discussed above, the Defendants' motions to dismiss the Superseding Indictment [dkt. nos. 45, 48] are denied.  A pretrial conference shall be held on January 23 at 2:00 PM.


SO ORDERED.


Dated:     New York, New York
           January **3**, 2019

_Loretta A. Preska_
LORETTA A. PRESKA
Senior United States District Judge