**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

       -against-

CHUCK CONNORS PERSON,

               Defendant.

17-CR-683 (LAP)

**SENTENCING MEMORANDUM ON BEHALF OF CHUCK PERSON**

SHER TREMONTE LLP
Michael Tremonte
Theresa Trzaskoma
Michael W. Gibaldi
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
ttrzaskoma@shertremonte.com

*Counsel for Chuck Person*

The conviction in this case represent an utter aberration in the life of a man whose personal history and characteristics are truly remarkable. Chuck Person's life story does not merely include a record of giving to others; it is a life *defined* by helping others – a life fundamentally at odds with the events of this case.

A legend of 1980s and 1990s basketball, Chuck Person is well known as an exceptional basketball player and coach. Physically gifted with an extraordinary work ethic, Chuck honed his talents on the basketball courts of a small town in rural Alabama, went on to be a star player at Auburn University, and then had a long, successful career in the NBA. Known as "The Rifleman," Chuck was adored by coaches, teammates, and fans. When his playing career ended, Chuck turned his love and knowledge of basketball to coaching. In 2014, Chuck became an assistant coach for Auburn and threw himself into that job with enormous passion and dedication. Chuck was a coach's player and a player's coach. And he was proud to be working for his beloved alma mater, Auburn.

But Chuck Person is, and always has been, much more than a great basketball player and coach. The 72 letters to the Court written by Chuck's family, friends, and colleagues focus not on Chuck's basketball prowess, but on how "compassionate," "kind," "gentle," "caring," and "extremely loyal" Chuck is. Though an NBA superstar, Chuck has remained humble and accessible. Through acts of kindness both large and small, he has made a difference in countless people's lives. He is part of a sprawling but close-knit and supportive family. He is a loving and dedicated father and grandfather. He recently married Leah Person, a registered nurse, and has become a devoted stepfather to her children.

Although tremendously talented and unfailingly altruistic, Chuck has always been terrible with money. Having grown up dirt-poor, Chuck never learned to save or manage his finances. In

terms of his career, Chuck never made a decision based on where he could make the most money. Instead, he repeatedly prioritized his love of basketball and coaching over financial rewards. More than that, Chuck has always been generous to a fault. He bought houses and vacations for family members, financed scholarships and tuitions, funded his old high school basketball program, and built a community center. Whenever someone came to him in need – be it a close friend or complete stranger – Chuck, who knew all too well what it was like to be poor, said yes.

Chuck's singular focus on basketball, his failure to plan for his financial future, and his unbounded generosity ultimately had catastrophic consequences. In 2016, though making a fine salary as an assistant coach at Auburn and enjoying a relatively modest lifestyle, living in a suburban rental home and driving a leased Hyundai, Chuck was deeply in debt. He was spending much of his income to support his now ex-wife and her family. He had bank loans (one used to finance a community center in his hometown) and several private loans. Worse, one financial institution had obtained a default judgment against Chuck (a loan on a business investment that did not pan out) and was garnishing twenty-five percent of Chuck's Auburn wages. Creditors were growing impatient and Chuck was becoming desperate. Chuck could have turned to his many friends for help, but he was embarrassed and ashamed. Instead, he asked an acquaintance, Rashan Michel, to help him find another private loan for $50,000.

Chuck's request for a loan led him to an Applebee's restaurant in November 2016, where Michel introduced Chuck to Marty Blazer. Blazer, who held himself out as a financial advisor but was in reality a government cooperator, agreed to give Chuck a loan, but it had a twist: Blazer proposed, and Chuck readily agreed, that the loan could be offset if Chuck referred Auburn players to use Blazer's services as a financial advisor. Chuck signed a promissory note

and, over the next few months, accepted $91,500 from Blazer, which Chuck used to repay creditors. As requested, Chuck introduced two players and their families to Blazer.

Chuck knew this was wrong. He knew he was violating the NCAA rules. He knew he was betraying his players and their families. And he knew he was betraying Auburn. Many of Chuck's supporters express real "shock" at this offense because it was so completely "against Chuck's character" and "not indicative" of his true nature. It was entirely out of keeping for someone who had tried to live an honorable life. There is no excuse for Chuck's conduct, and he is humiliated to have let down so many people – including especially his players, his Auburn community, and his family. His remorse is profound and real.

Chuck has already suffered enormously. He lost two of the most important things in his life: his coaching job and his connection to the Auburn community. For nearly a year after his arrest, Chuck was essentially on home confinement. An easily recognizable figure in and around Auburn (at 6'8" and 300 pounds, he can hardly keep a low profile), Chuck spent most of the time after his widely publicized arrest in his house or taking walks around his neighborhood.

Since Chuck moved to Atlanta last year, though, he has started a personal basketball training business that has allowed Chuck to return to doing what he loves most: coaching. Charging on a sliding scale according to ability to pay, he is working with teenagers, college students, and aspiring professional athletes. He wants to continue to mentor young players and is committed to satisfying the forfeiture order, getting right with his creditors, and finally putting himself on stable financial ground. His meaningful efforts to make amends and begin a new life make clear that he poses zero risk of recidivism.

Under these circumstances, consistent with the Probation Department's recommendation, imprisonment is neither necessary nor warranted. Instead, we respectfully submit that a sentence

of probation – with a very substantial community service component – would be "sufficient, but not greater than necessary" to further the purposes of sentencing. *See* 18 U.S.C. § 3553(a).

## FACTUAL BACKGROUND[1]

### *Chuck's Humble Beginnings in Rural Alabama*

Chuck was born and raised in a town of fewer than one thousand residents deep in southern Alabama called Brantley. Brantley was a segregated, rural community with a small main street, a single stoplight, and a postage-stamp-sized post office. Remnants of slavery still exist, including an old plantation and slave house. Chuck remembers being told not to cross the bridge that led to the white area, and he recalls having to enter the town's only restaurant through the back door.[2]

Chuck and his six siblings were raised by their mother Mary Person and their maternal grandmother Susie Lee Person in a small three-bedroom house in the African-American part of town. Quarters were cramped; Chuck and two brothers shared a single bed, where they slept head-to-foot, and a fourth brother slept in another bed in the same room. Chuck never lived with his father, Leroy Bogen, Sr., a garment factory foreman, who was raising another family in a separate house just across the street.

Chuck's mother labored long hours in the same garment factory as Chuck's father, but a work-related injury forced her to retire when Chuck was around ten years old. After that, Chuck's family depended on public assistance, and Chuck and his siblings often went hungry. There was never any money for clothing or shoes. When Chuck was twelve years old, he took an

---

[1]     The following facts are drawn from the Probation Department's Presentence Investigation Report ("PSR"); the government's discovery; counsel's interviews with Chuck, his family, and friends; and the letters from his family and friends attached hereto as **Exhibit A**.

[2]     According to Chuck, "race relations have improved," PSR ¶ 96, but only two years ago, an elaborate shrine to the Confederacy was erected just outside of Brantley. *See* Connor Sheets, *New Confederate memorial unveiled in Alabama*, AL.com, https://www.al.com/news/2017/08/more_than_200_people_attend_un.html.

after-school job operating a motorized saw in a sawmill – an extremely dangerous job, especially for a child. Every penny he made went to support his family – a habit he maintained throughout his life. When Chuck was in high school, he took a job cleaning the school early in the morning and late into the evening. Though only sixteen years old, Chuck was entrusted with keys to the entire facility.

Despite the extreme poverty and challenging circumstances that defined his upbringing, Chuck recalls his childhood with great fondness. His community was large but tightly connected. He had a good relationship with his father, and with his father's wife, Lucille, who – despite the circumstances – welcomed Chuck into their home, reminding all the children that they were not responsible for their father's affairs. Chuck played frequently and was very close with all of his full- and half-siblings. Chuck's optimistic outlook on life, including his positive perspective on a childhood that posed a great many challenges, is another trait that has endured throughout his life.

### Chuck's Emergence as a Star Basketball Player

The trajectory of Chuck's life changed when he met his high school basketball coach, Earl Henderson. Coach Henderson recognized Chuck's raw talent and nurtured Chuck's development as a player and as a young man. Coach Henderson describes coaching Chuck as "the high point of my career." Ex. A at 4 (E. Henderson Ltr.). Even as a teenager, Chuck was "hard working, highly intelligent, athletic, determined, cooperative, teachable, generous [and] kind hearted." *Id.* Coach Henderson and his wife Gayle became parental figures to Chuck, teaching Chuck table manners and buying Chuck his first pair of blue jeans, and they remain very close to Chuck to this day. *See id*. ("I treated him as I would have if I had had a son."). Under Coach Henderson's tutelage, Chuck grew as a student and athlete.

Chuck was an absolute star in high school, averaging 33.8 points and 21 rebounds per game, and was heavily recruited by several elite college basketball programs. Among the suitors was Auburn University, just an hour's drive from Brantley. As Coach Henderson recalls with deep emotion, Chuck was so poor that when he first went to meet Auburn's legendary coach Charles "Sonny" Smith, Chuck was wearing hand-me-down pants that were too short and had holes in them.

Ultimately, Chuck decided Auburn was the place for him, and he made a lasting impression on the university and his coaches. On the basketball court, Chuck did not simply rely on his natural abilities; he worked hard for his success. According to one of his college coaches, "Chuck *made* himself into an exceptional basketball player by working incredibly hard on the court and in the weight room. He was literally the first player on the court every day and the last one to leave." Ex. A at 43 (M. McCarthy Ltr.) (emphasis in original). Chuck spent his free time sitting in on coaches' meetings, working on his shooting, and analyzing film. Coach Smith, who coached other basketball greats, readily declares that Chuck was "my favorite player ever" and describes Chuck as having exhibited "great determination and hard work" with a "good heart." Ex. A at 8 (S. Smith Ltr.).

Chuck's hard work at Auburn paid off, both for himself and for his school. In 1985, Chuck was named USA Basketball Male Athlete of the Year, and in the 1985-1986 season, Chuck led Auburn to its first-ever appearance in the "Elite Eight" of the NCAA tournament. Even though the three-point shot had not yet been adopted in college basketball, Chuck became and remains Auburn's all-time leading scorer and is widely viewed as Auburn's best player ever. Though Chuck attended Auburn for four years, he did not obtain his degree in that time. It was

difficult to balance the full-time commitment to basketball with his studies, and he had to work

during his summers. Still, Chuck is and was an Auburn man through and through.

***Chuck Remains Generous, Kind, and Humble Throughout His Career as an NBA Star***

Following his exceptional college career, the Indiana Pacers selected Chuck with the

fourth overall pick of the 1986 NBA Draft. Chuck continued his "superb" play in his NBA

rookie season, averaging 18.8 points and 8.3 rebounds per game, and he earned the Rookie of the

Year award in 1987.[3] Herb Williams, a former teammate, ascribes Chuck's success to hard work

and dedication; "[a]s a rookie, Chuck showed great work ethic by being the first to practice and

the last to leave." Ex. A at 59 (H. Williams Ltr.). Longtime Pacers President Donnie Walsh

explains that Chuck was "a key member of the team through 1992," Ex. A at 62 (D. Walsh Ltr.),

and the Pacers play-by-play announcer describes Chuck as the "team's best player" at that time,

Ex. A at 66 (M. Boyle Ltr.). Another basketball fan explains how he "idolized Chuck" when he

was growing up. Ex. A at 96 (A. Cormier Ltr.). And multiple Pacers fans remember having cried

when Chuck was traded to the Minnesota Timberwolves in 1992. Ex. A at 71 (E. Freeman Ltr.);

Ex. A at 83 (C. Hill Ltr.). As many of the letters to the Court convey, Chuck rose to the level of

NBA superstar in the 1980s and 1990s. Ultimately, Chuck enjoyed a successful fifteen-year

NBA career, playing also for the San Antonio Spurs, Charlotte Hornets, Seattle SuperSonics, and

briefly for the Los Angeles Lakers. There is even a sign in front of Chuck's old school

proclaiming that "this is the home of Chuck Person," Brantley's hometown hero. *See* Ex. A at 4

---

[3]      *See* NBA, 1980s Pacers at a Glance: Chuck Person, https://www.nba.com/pacers/gallery/1980s-pacers-glance-chuck-person/ (last visited June 19, 2019); *see also* Douglas S. Looney, *A Very Special Person: The Pacers' Chuck Person is winning fans, and games, in Indy*, Sports Illustrated, Jan. 12, 1987, *available at* https://www.si.com/vault/issue/702352/89 (noting that "Larry Bird counts him among the best to come into the league in years").

(E. Henderson Ltr.). Chuck's lifelong friend Henry Baugh is so proud of Chuck that he makes sure to clean the sign at least once a year.

One might expect this level of fame would have caused Chuck to become at least a bit self-centered. But it did not. Former NBA player and coach Reggie Theus puts it this way: "Chuck is a former NBA superstar, and one of the most liked stars to ever play in the NBA. Yet, Chuck is the most humble, kind and gentle person you will ever meet." Ex. A at 91 (R. Theus Ltr.). Chuck treated everyone with respect and exuded a "self-awareness and humility" rare among his peers. Ex. A at 69 (M. Montieth Ltr.); *see also* Ex. A at 65 (D. Benner Ltr.); Ex. A at 66–67 (M. Boyle Ltr.); Ex. A at 64 (D. Craig Ltr.); Ex. A at 84–85 (M. Jones Ltr.). For instance, when former Pacers player Roger Brown was diagnosed with colon cancer, Chuck "visited [Roger] every day for a week even though he was playing in San Antonio and the season was still going on." Ex. A at 79 (J. Brown Ltr.). Chuck's modesty was matched by his "big generous heart," Ex. A at 56 (V. Strickland Ltr.), and he "never forgot where he came from," Ex. A at 4 (E. Henderson Ltr.).

Chuck was generous with his time, particularly toward his young fans. Numerous letters to the Court attest to Chuck's positive impact as a role model. "Chuck always took the time to speak to kids and sign autographs for them." Ex. A at 59 (H. Williams Ltr.). Chuck was "community minded" and "never wavered whenever he volunteered to make an appearance on behalf of the team," be it "speaking to young people about the dangers of drugs and alcohol," "encouraging kids to stay in school," or "dressing up as Santa Claus thrilling young Black children who, in those days, had never seen a Santa who looked like them." Ex. A at 10 (K. Jordan Ltr.); *see also* Ex. A at 75–76 (L. Thompson Ltr.); Ex. A at 60 (R. Stepp Ltr.). When Chuck played for the Pacers, Chuck set up "a great basketball hoop in his driveway" where

neighborhood kids could play with Chuck "anywhere from 15 minutes to an hour" at a time. Ex. A at 83 (C. Hill Ltr.). Chuck's coach, Bob Hill, remembers vividly one instance during these pickup games when Chuck spent thirty minutes speaking to a young man with Down syndrome about the rival Detroit Pistons. Ex. A at 81–82 (B. Hill Ltr.). Every off-season, Chuck returned to Brantley and "would host some type of sporting event for the youth." Ex. A at 21 (Lori Person Ltr.).

### Chuck Retires as a Player and Embarks on His Coaching Career

Many years before his playing career ended, Chuck set his sights on coaching. He had always been a devoted student of the game, but he started planning in earnest to make the transition from player to coach. In 1998, Chuck stopped going out to parties with his teammates because he expected that he might soon coach them. *See* PSR ¶ 114. Chuck began spending more time with his coaches to learn about basketball strategy and building a team. When he arrived in Los Angeles at the very end of his playing years, Chuck spoke openly with his head coach, Phil Jackson, about a future coaching basketball. *See* Dave McMenamin, *He's the right person*, ESPN, June 15, 2010, https://www.espn.com/los-angeles/nba/columns/story?id=5278158.

In 2001, Chuck retired as a player and devoted everything he had to becoming a great coach, joining "[h]is love and devotion for basketball" with his passion "for helping younger men achieve[] [their] goals." Ex. A at 61 (B. Rowsom Ltr.). After a brief stint as an assistant coach in Cleveland in 2001, Chuck moved to the front office of the Pacers, where he worked as a player-relations assistant and a scout. In 2005, Chuck returned to the bench as an assistant coach for the Pacers. Mark Boyle recalls how, during that time, Chuck "spent more than a few hours beyond what was expected trying to contribute." Ex. A at 66 (M. Boyle Ltr.).

In 2007, Chuck could have returned to the front office of the Pacers for a higher salary, but as an "enthusiastic student of the game," Ex. A at 44 (M. McCarthy Ltr.), Chuck took yet another pay cut and joined the Sacramento Kings as an assistant coach. Chuck's colleague at Sacramento, Rex Kalamian, reminisces how, "[d]uring our time working together in Sacramento, Chuck was always available with his time and advice to younger coaches on how to improve their craft." Ex. A at 90 (R. Kalamian Ltr.). The Kings' head coach, Reggie Theus, echoes this: "Chuck's work ethic is second to none and he worked tirelessly to keep our players motivated to succeed, both on and off the court." Ex. A at 91 (R. Theus Ltr.).

By this point in his coaching career, Chuck was widely recognized to be "[o]n pace to be a great head coach." Ex. A at 91 (R. Theus Ltr.). In 2008, the Chicago Bulls invited Chuck to interview to be the team's head coach.[4] Chuck narrowly missed getting that job and returned to the Kings for a second season. Chuck then went to work as an assistant coach to the great Phil Jackson and was part of the Los Angeles Lakers' 2009 championship team. In 2013, determined to demonstrate his abilities, Chuck moved to South Korea and served as the associate head coach for the Jeonju KCC Egis in the Korean Basketball League.

Then, in 2014, a dream opportunity emerged: Auburn University, Chuck's alma mater, was looking for a new head coach. Chuck promptly flew from South Korea back to Alabama for the interview. In March 2014, however, Auburn announced that it was hiring Bruce Pearl, the former head coach of Tennessee, even though Pearl was still subject to NCAA sanctions for recruiting violations. Chuck was heartbroken at the lost opportunity, but Pearl, who was not able to recruit while he remained under the show-cause penalty, asked Chuck to serve as an assistant

---

[4]     *See* Dave McMenamin, *He's the right person*, ESPN, June 15, 2010, https://www.espn.com/los-angeles/nba/columns/story?id=5278158.

coach. Although Chuck could have returned to the NBA and made more money, he instead accepted Pearl's offer out of intense devotion to his alma mater and his passion for coaching young players. *See* Ex. A at 73 (D. Demps Ltr.) ("I tried multiple times to hire Chuck to mentor our players"); Ex. A at 68 (M. Montieth Ltr.) (noting that Chuck "g[a]ve up a comfortable front office position in the NBA to take on the grind of working as an assistant coach for a major college program").

"Chuck was genuinely excited about being back at his alma mater to coach and have a positive influence on young people through basketball." Ex. A at 58 (C. Kellogg Ltr.). Rather than wallow in disappointment at not being the head coach, consistent with his positive attitude, Chuck "attack[ed] this coaching opportunity as he did the playing opportunity when he first got to Auburn in the 1980s." Ex. A at 44 (M. McCarthy Ltr.). And in his free time, Chuck finally earned his college degree *cum laude* because he knew it would help him realize his dream to become a head coach one day. Chuck "loved being back [at Auburn] and apart of the basketball team again," Ex. A at 56 (V. Strickland Ltr.), and with Chuck's recruiting abilities and coaching talents, Auburn became a premier college basketball program for the first time since Chuck's playing days in the 1980s.

### Chuck's Exceptional Generosity and Devotion to Family

Through it all, Chuck has been "a warm compassionate man," Ex. A at 25 (A. Fowler Ltr.), with "a sense of caring for all those who he came in touch with," Ex. A at 80 (G. Felton Ltr.). "There isn't anything Chuck Person wouldn't do to help anyone in need." Ex. at 37 (M. Merrill Ltr.). Upon receiving his very first NBA paycheck, for example, Chuck sent most of it home to his family in Brantley and bought his mother a modest house with the remainder. Chuck's sister Carolyn describes how, over the years, Chuck bought his family "cars, homes and

the things we needed" and "took us on vacations every year for 2 weeks." Ex. A at 15 (Carolyn Person Ltr.); *see also* Ex. A at 19 (Margaret Kendrick Ltr.); Ex. A at 23 (Cassandra Person Ltr.). Driving through Chuck's neighborhood in Brantley, it seems like every other house was a gift from Chuck to one family member or another. Chuck's brother Chester similarly explains how Chuck "took care of my family when we needed it," including "[giving] my wife and I a piece of land so we could put a home there." Ex. A at 18 (Chester Person Ltr.). When Chuck's niece Cassandra graduated from high school, "he let [her] stay in his apartment rent free because [she] needed somewhere to stay," and he helped her with bills and groceries. Ex. A at 23 (Cassandra Person Ltr.). Over the course of his playing career, Chuck bought houses for at least ten family members, numerous cars for others, and paid college tuition for two of his nieces. He bought a car for Coach Henderson (that still sits in Coach Henderson's driveway), and a Rolex watch for Coach Smith.

Chuck's financial generosity extended well beyond his family. "His mindset is if he has it, you need it, you can have it. Whether he knew you or not. . . . His heart is truly fulfilled to be able to see and make someone else happy." Ex. A at 1 (Leah Person Ltr.). He "helped everyone" in his community with everything from bills and family vacations, PSR ¶ 97, to burial fees and books, Ex. A at 15 (Carolyn Person Ltr) He was "very generous to his [high school] with uniforms, gym enhancements, computers and many other things," Ex. A at 4 (E. Henderson Ltr.), funding the computer lab and purchasing computers for each classroom. Fully aware of his hometown's needs, Chuck donated "school supplies and shoes" to Brantley children, Ex. A at 33 (J. Jackson Ltr.), and "established a fund for needy students at his high school, Brantley High School, to be able to attend college," Ex. A at 8 (S. Smith Ltr.). In 1994, at the peak of his professional basketball career, Chuck proudly built a softball complex in Lavurne, Alabama,

where local children could play sports and spend time after school. Chuck financed the project in part with a $300,000 loan from First Citizens' Bank. And in 1997, when former Pacers player Roger Brown died, Chuck paid for the funeral and burial after learning that Brown had died poor and without life insurance. Ex. A at 79 (J. Brown Ltr.).

When Chuck played for the Pacers, "[o]ne of his main initiatives was providing financial support to assist disadvantaged youth in pursuing their college degrees at Ivy Tech College." Ex. A at 55 (C. Abernathy Ltr.). Chuck, "without hesitation, agreed to . . . endow[] the scholarship with $25,000 so it would last into perpetuity." Ex. A at 9 (K. Jordan Ltr.). Chuck paid college tuition for a co-worker's son. Ex. A at 71 (E. Freeman Ltr.). He gave "large amounts of money to random people that he didn't even know, just because they were in need." Ex. A at 84 (M. Jones Ltr.). "Rarely, if at all, did he pass on making a personal donation to United Way and numerous other local charities. Whenever he saw a need or was asked, Chuck gave and never sought recognition or anything in return." Ex. A at 10 (K. Jordan Ltr.). One former colleague and friend describes actual "tears in my eyes" as he reflects upon Chuck's generosity to those in need – "tuitions, utility bills, rent, car payments, donations to community centers, uniforms for youth teams, Turkey feeds, Christmas gifts for the poor, opening his home to people in need, the charity work." Ex. A at 73 (D. Demps Ltr.).

Chuck is also a devoted father. At the beginning of his NBA career, Chuck married his high school sweetheart Kimberly Rutland. When it became clear that Kim's sister could not take care of her five-year-old daughter, Millicent, Chuck and Kim formally adopted Millicent. Chuck and Kim later adopted a second child, Tiffany, from a special needs adoption center in Fort Wayne, Indiana. Although Chuck's first marriage ended in divorce, he remains a "loving" father

to both Millicent, who lives in Washington, DC, and Tiffany, who is grown but unable to live alone so stays with Chuck's sister in Brantley. *See* PSR ¶ 100.

Chuck married Carmen Sudderth in 2004. Consistent with his generous heart, Chuck raised Carmen's three daughters – Niketta, Raven, and Jasmine – as his own and is a loving and caring stepfather. When Niketta became pregnant at a young age, Chuck stood by her. Niketta (now 31 years old) has three children, and Chuck has assisted all of them financially. Niketta describes Chuck as "one of the most important men in my life" and the "only 'PawPaw'; grandfather our 9 children know." Ex. A at 12 (N. Person Ltr.). In 2016, though estranged from Carmen, Chuck was still supporting her and her children and grandchildren, and remained "the anchor to [that] family, emotionally and financially." *Id.*

### Chuck's Hidden Financial Struggles

Chuck has lived a model life in many respects. He is a self-made superstar athlete who has remained kind, humble, and loyal to his family and his hometown. But lurking behind this success has been the unfortunate reality that Chuck is "horrible" with "money management." Ex. A at 1 (Leah Person Ltr.). Chuck never lived a lavish lifestyle, but because he was "generous to a fault" with his NBA millions and largely "gave it all away," he failed to save a penny for his own future. *See id.*

Chuck's financial irresponsibility caught up to him around the time that he retired as a player, when his income suddenly plummeted. Compounding the challenges brought on by this substantial pay cut, Chuck and his first wife Kim were divorcing. Chuck agreed to pay Kim nearly $30,000 a month in alimony, an amount that had been based upon his player's salary. After his retirement, when his first job for the Cleveland Cavaliers paid only $18,000 for the

year, Chuck continued to pay the same alimony amount. To meet his obligations, Chuck

withdrew approximately $800,000 from his pension and incurred severe tax penalties.[5]

Chuck took on additional debt in 2005 shortly after he first met his co-defendant in this

case, Rashan Michel. Michel was a tailor who specialized in making suits for professional

athletes. Chuck, who was an assistant coach for the Pacers and aspired to become a head coach,

wanted to look the part, so he bought a few suits from Michel. (Chuck cannot buy suits off the

rack.) Chuck ordered a few more, and Michel offered to defer payment. Chuck took Michel up

on the offer since, given his alimony, child support payments, stepchildren to raise, and loan

payments, he was struggling to make ends meet.

Although Chuck's financial situation was worsening, he did not make career decisions

based on where he could earn the most. Instead, he remained motivated solely by his passion for

basketball and coaching. Unfortunately, Chuck's earnings as an assistant coach were not

sufficient to cover his modest personal expenses, ongoing financial support for family and

friends, and increasing loan obligations. Chuck repeatedly made the mistake of taking out new

personal loans from private lenders. He borrowed $100,000 in 2004, $50,000 in 2009, and

another $150,000 in 2012. Michel, who had begun to pressure Chuck for repayment, put Chuck

in touch with Cobalt Sports Capital, a lender that targeted professional athletes with high interest

personal loans. In 2013, Chuck borrowed $75,000 from Cobalt, but that was not enough to tide

---

[5]     Chuck's predicament with his end-of-career divorce is not unusual. Divorce, particularly around the time of
a professional athlete's retirement, is a leading reason why an estimated 60% of former NBA players are penniless
within five years of retirement. *See generally* Pablo S. Torre, *How (And Why) Athletes Go Broke*, Sports Illustrated,
Mar. 23, 2009, *available at* https://www.si.com/vault/2009/03/23/105789480/how-and-why-athletes-go-broke. Nor
is Chuck's failure to plan for his financial future out of the ordinary, particularly for players of his generation.
Although the NBA and the NBA Players Association now educate players about the importance of careful financial
planning and decision making, such financial literacy programs did not exist when Chuck was playing.

Chuck along. Chuck's various debts, some of which had extremely high interest rates, began to compound as Chuck missed payment after payment.

By the time Chuck returned to Auburn's campus as an assistant coach in 2014, decades of reckless generosity and a lifelong lack of financial savvy had put him at the breaking point. Numerous creditors were demanding to be repaid immediately. Hoping (irrationally) that he could dig himself out of the hole, Chuck took out yet another loan for $60,000 from the Crenshaw County Economic and Industrial Development Authority ("CCEIDA") to finance a hair salon. But the business failed, and Chuck soon defaulted on the loan. In 2016, CCEIDA obtained a judgment and began garnishing twenty-five percent of Chuck's wages, nearly $4,000 per month. Still, Chuck continued paying half of his regular monthly income to his then-wife Carmen, and providing as much support as he could to his other numerous family members and dependents.

### Marty Blazer and Rashan Michel Propose an Illegal Loan to Chuck

Rashan Michel was one of the creditors hounding Chuck. In early 2016, Chuck confided in Michel that he needed another loan. Michel responded that he knew a potential lender in Florida. Chuck filled out a loan application and submitted financial information, all through Michel. Unfortunately, in June 2016, Chuck learned from Michel that the Florida loan had fallen through.

Unbeknownst to Chuck, at the same time Chuck was asking for Michel's help in finding a loan, Michel had been speaking with Blazer about identifying college coaches who might be willing to refer college athletes to Blazer in exchange for payments. Michel did not immediately suggest Chuck to Blazer, but as time went on and Chuck's financial situation worsened, Michel finally told Blazer that he knew a coach at Auburn who needed money and later revealed that his

"guy" was Chuck. Blazer and Michel did not immediately approach Chuck but spoke at length during October and November 2016 about how to structure a $50,000 loan to Chuck that would be "offset" by Chuck's referrals of Auburn basketball players to Blazer if and when those players entered the NBA. Michel assured Blazer that Chuck would do "what I tell him to do" because Chuck was so desperate for money. Chuck was not involved in any of these conversations, but at some point in the fall of 2016, Michel told Chuck that he had identified another lender who could provide Chuck a financial lifeline.

On November 29, 2016 – over one year after Blazer and Michel had first started discussing their scheme to pay college coaches – Michel arranged for Blazer to meet Chuck at an Applebee's restaurant near Auburn University. In advance of the meeting, Michel explained to Chuck that Chuck would be expected to refer players to Blazer, but Michel also made clear that Blazer's payments would be a loan. For instance, in a text message the day before the Applebee's meeting, Michel told Chuck that Blazer needed information to perform a "loan Credit check." And Chuck did sign a written promissory note agreeing to repay the money to Blazer. But Chuck acknowledges that the loan contained an unwritten, undefined provision requiring Chuck to introduce players to Blazer, an agreement that violated the NCAA rules.[6]

Further, Chuck did more than just accept Blazer's money; he also arranged meetings among Blazer, two Auburn basketball players, and their families, and he encouraged those players to use Blazer's services even though Chuck's only knowledge of Blazer came through

---

[6]     Blazer's conversations with Michel – again outside Chuck's presence – suggest that Blazer and Michel were taking advantage of Chuck's financial desperation and also that Chuck may have remained on the hook for at least a portion of the money Blazer had given him. For instance, in a wiretap recording on February 7, 2017, Michel reminded Blazer that Chuck was a "special situation" who would do "whatever I want, whenever I want, however I want" because "Chuck actually needed the money." In another wiretap recording on May 19, 2017, many months after Blazer's meetings with the Auburn players, Michel emphasized that the payments to Chuck were a loan: "Ultimately, at the end of the day, Chuck's gotta pay that money back . . . ."

Michel. In accepting responsibility for his actions, Chuck has been forthcoming about the fact that he knew these arrangements betrayed his players and put them personally at risk.[7]

Chuck was never motivated by greed; he was driven by financial desperation. Chuck did not use the money he received from Blazer to support an extravagant lifestyle. Instead, Chuck used every penny to repay his creditors. Between June 30, 2016 and August 29, 2017, Chuck paid over $93,000 to various creditors – more than the $91,500 he accepted from Blazer between November 2016 through July 2017.

### Chuck Accepts Responsibility for His Actions and Is Committed to Redemption

Chuck's terrible decision to accept payments and introduce players to Blazer has caused Chuck immense pain, shame, and remorse. *See* Ex. A at 2 (Leah Person Ltr.) (describing how Chuck has broken down "in tears a few times throughout the nights"). Chuck's biggest regret is that he breached the trust that his players and their families placed in him. *See* PSR ¶ 65.

But Chuck is deeply committed to redeeming himself. Recently, Chuck has found renewed happiness with his wife, Leah Person, and her children. Leah, who works as a registered nurse, has provided invaluable support to Chuck throughout the ordeal of the past two years. And, even while this case hangs over his head, "Chuck has chosen to focus on others rather than himself." Ex. A at 26 (Gwendolyn Fowler Ltr.). For instance, during the pendency of this case, Chuck continues to visit a friend who is suffering from Lou Gehrig's disease. *See* Ex. A at 41–42 (Gary Godfrey Ltr.). And Chuck has become a devoted stepfather to Leah's children. He regularly takes Leah's fourteen-year-old daughter to and from volleyball games; he travels to Indiana to help Leah's twenty-five-year-old son with a new business; and he has provided

---

[7]     Although the government has suggested in its charging documents and press releases that Chuck accepted payments from more than one financial advisor, that is not true.

support and encouragement for Leah's twenty-one-year-old daughter in the Air Force and Leah's

twenty-three-year-old son who recently graduated from college. *See id.* Leah's youngest, A.D.,[8]

writes in her own words how Chuck has been "the best example of a father figure by the way he

can make someone laugh" and how he "honestly has a really soft heart and cares about

everyone." Ex. A at 13 (A.D. Ltr.).

Despite the difficulties of this case, Chuck has not abandoned "his passion to help and

serve others though sports." Ex. A at 22 (K. Person Ltr.). Chuck recently started a new business

training and "helping young men reach their dreams." Ex. A at 2 (Leah Person Ltr.). To support

himself and his family financially, to ensure that he can satisfy the forfeiture order in this case,

and because he cannot contain his passion to help others, Chuck has been training a range of

young players. "Chuck takes personal interest in all the kids" and works with them "to set

academic and athletic goals." Ex. A at 98 (C. Williamson Ltr.). Chuck is committed to being the

kind of mentor to his kids that Coach Henderson and Coach Smith were to him. He cares not

only about improving their basketball game but also about their development as young men.

Chuck speaks openly with them about "the mistakes he's made" and, even more importantly,

"the corrective measures he was taking to become a better person." *Id.* Anthony Cormier, the

father of one of Chuck's players, attests to Chuck's enduring "special gift with the youth that I

witness daily." Ex. A at 96 (A. Cormier Ltr.).

## PROCEDURAL BACKGROUND

### I.    The Charges and Plea Allocution

Chuck was arrested on a complaint early in the morning of September 26, 2017, in

Alabama, and was detained for approximately eight hours. He was charged by Indictment on

---

[8]        Pursuant to Fed. R. Crim. P. 49.1(a)(3), we use initials instead of A.D.'s full name.

November 7, 2017, and by Superseding Indictment on May 31, 2018. The charges in the NCAA basketball cases generated enormous publicity, and Chuck was by far the highest profile defendant. Auburn immediately suspended Chuck without pay and terminated his employment within a month.

On March 19, 2019, Chuck appeared before this Court and pleaded guilty to Count One of the Superseding Indictment (conspiracy to commit federal funds bribery) pursuant to a plea agreement. At the plea hearing, Chuck admitted that he had agreed with Michel to accept bribes in exchange for agreeing to steer Auburn basketball players to Blazer's financial advisory business. Chuck further admitted that he knew what he did was wrong. Chuck also consented to entry of a Preliminary Order of Forfeiture in the amount of $91,500 – the amount he received from Blazer.

## II.   The Guidelines Calculation and the Probation Department's Recommendation

Pursuant to the plea agreement, the parties stipulated that, under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"),[9] the Guidelines provision applicable to the offense charged in Count One is U.S.S.G. § 2C1.1. The parties further stipulated that the following Guidelines provisions apply:

- Pursuant to U.S.S.G. § 2C1.1(a)(2), the base offense level for Count One is 12 because Chuck was not a public official;

- Pursuant to U.S.S.G. § 2C1.1(b)(1), 2 levels are added because the offense involved more than one bribe;

- Pursuant to U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(D), 6 levels are added because the value of the payment was greater than $40,000 but less than $95,000;

- Pursuant to U.S.S.G. § 3E1.1(a), the offense level is decreased by 2 levels because Chuck has demonstrated acceptance of responsibility; and

---

[9]     The parties stipulated that the November 1, 2018 Guidelines manual applies in this case.

- Pursuant to U.S.S.G. § 3E1.1(b), the offense level is decreased by 1 level because Chuck gave timely notice of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

Accordingly, the total offense level is 17.

The parties have also stipulated that Chuck has no criminal history points and, therefore, his Criminal History Category is I.

Accordingly, Chuck's Guidelines range is 24 to 30 months.

Based upon its investigation and evaluation of this case, the Probation Department endorses a substantial variance from the Guidelines and concludes that a custodial sentence "may be greater than necessary." PSR at 33. Instead of imprisonment, the Probation Department recommends a non-custodial sentence "of Time Served to be followed by three years' supervised release with six months of location monitoring." *Id.* In support of its recommendation, the Probation Department observes that Chuck has been "forthcoming about his conduct," he is "genuinely remorseful" and "has accepted responsibility for his actions," the offense was non-violent, and Chuck has lived an otherwise law-abiding and generous life. *See id.* at 34–35. Notably, the Probation Department's own investigation has revealed the same gracious character described in the letters submitted by Chuck's supporters: "During our collateral interviews with Person's family and friends, they all shared a common theme that the defendant is kind-hearted, generous, and helpful." *Id.* at 34.

## **ARGUMENT**

### I.   **Legal Standard**

Section 3553(a) of Title 18 provides that "[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Among the factors to be considered are

(1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, and (3) "the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from future crimes of the defendant." 18 U.S.C. § 3553(a).

As the Supreme Court reaffirmed in *Pepper v. United States*, the sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." 562 U.S. 476, 487 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). While the Guidelines are the "starting point and the initial benchmark," the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *United States v. Al Halabi*, 563 F. App'x 55, 57 (2d Cir. 2014). Rather, sentencing courts are directed to make an "individualized assessment" of the sentence warranted by § 3553(a) "based on the facts presented." *Gall*, 552 U.S. at 50; *United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014). Thus, in addition to the Guidelines, courts are also required to consider a variety of other factors set forth in § 3553(a), including the "nature and circumstances of the offense" and the "history and personal characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Indeed, the United States Supreme Court has "emphasized that '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'" *Pepper*, 562 U.S. at 487–88 (citations omitted) (alterations in original).

Ultimately, as the Second Circuit has recently instructed, "a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and

in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (internal quotation marks

omitted).

## II.     The § 3553(a) Factors Support a Sentence of Probation Plus Community Service

Although we have agreed to the calculation of the Guidelines range in this case, that

range overstates Chuck's culpability. As the Probation Department has recognized, a proper

consideration of the § 3553(a) factors strongly supports a more lenient sentence in this case. *See,*

*e.g.*, *Gall*, 552 U.S. at 50 (holding that sentencing judge "may not presume that the Guidelines

range is reasonable").

### A.     A Non-Custodial Sentence Is Appropriate for Chuck, a First-Time, Non-Violent Offender

Even before *Booker*, courts recognized a basis for downward departure from the

Guidelines where the criminal conduct at issue was aberrational. *See Zecevic v. U.S. Parole*

*Comm'n*, 163 F.3d 731, 735 (2d Cir. 1998). And even where not meeting the strict standard of

aberrant behavior, courts have imposed non-Guidelines sentences where the defendant's conduct

was "out-of-keeping with [his] otherwise law-abiding and responsible life." *United States v.*

*Khalid*, No. 09-CR-734 (JBW), 2011 WL 6967993, at *2 (E.D.N.Y. Dec. 13, 2011); *accord*

*United States v. Marsh*, No. 10-CR-408 (JBW), 2011 WL 5325410, at *2 (E.D.N.Y. Oct. 26,

2011) (noting that "defendants' need for sanctions is not as great" where defendants had been

"law-abiding, supportive of their families, and earning a decent living through legal means").

Both the case law and the Sentencing Commission itself recognize that incarceration is not

necessary for individuals like Chuck, for whom the crime of conviction is a first-time brush with

the law that is completely inconsistent with their true character. *See, e.g.*, *United States v.*

*Toback*, No. 01-CR-410 (RWS), 2005 WL 992004, at *5 (S.D.N.Y. Apr. 14, 2005);

U.S. Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* 6–7 (2017), *available at* https://www.ussc.gov/sites/default/ files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf (finding that "[c]riminal history score and Criminal History Category are strong predictors of recidivism," based on data showing recidivism rates range from 30.2% of offenders with zero criminal history points to 85.7% of offenders with 15 or more criminal history points).

Not only that, in this federal funds bribery case, the Guidelines, which have been increased according to the loss amount table set forth in § 2B1.1, significantly overstate Chuck's culpability for several reasons.

*First*, Chuck did not accept more money from Blazer because he was greedy. Rather, Chuck accepted more money because he was desperately trying to stave off creditors. *Second*, Blazer and Michel were never clear about how much of the $91,500 anyone reasonably expected that Chuck would have to repay. Even after Chuck introduced players to Blazer, Michel reminded Blazer that, "at the end of the day, Chuck's gotta pay that money back." Ultimately, the amount of loan forgiveness (*i.e.*, the amount of the bribe) was going to depend on whether and when any of the players entered the NBA and retained Blazer to manage their money, contingencies that were arguably quite remote, especially when one considers that no basketball player had been drafted from Auburn in almost two decades. *Third*, the government controlled the amount that Blazer paid to Chuck. As discussed more fully below in the context of unwarranted sentencing disparities, Chuck committed the same crime as the other assistant coaches charged in the companion case pending before Judge Ramos. *See United States v. Evans, et al.*, No. 17 Cr. 684 (ER) (S.D.N.Y.). Yet Chuck's Guidelines range is slightly higher than those other coaches because (i) the government paid Chuck more money, and (ii) the

government made its arrests in this case in September 2017, shortly after Blazer had started

paying the other coaches. Another assistant coach, for example, agreed to accept $5,000 per

month in exchange for his agreement to refer players to Blazer, but the government chose to

arrest that coach after paying him for only four months (*i.e.*, $20,000). *See* Compl. ¶¶ 71, 89–92,

*United States v. Evans, et al.*, No. 17 Cr. 684 (ER) (S.D.N.Y. Sept. 25, 2017), ECF No. 1. In this

way, the government effectively influenced each defendant's respective loss amount and,

therefore, their Guidelines ranges.[10]

Finally, we note that the loss tables for fraud (applicable to the bribery charge here) have

been widely criticized as unduly harsh and irrational. Though the Sentencing Commission has

acknowledged that "loss . . . is a principal factor in determining the offense level" in cases of

economic crime, *see* U.S.S.G. § 2B1.1 Background Commentary, the Commission has not

"explain[ed] why it is appropriate to accord such huge weight" to the loss amount. *See United*

*States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (citing Kate Stith & Jose Cabranes,

*Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)). Moreover, "[e]ach of

the increases in the recommended Guideline ranges for fraud crimes was directed by Congress,

without the benefit of empirical study of actual fraud sentences by the Sentencing Commission."

*United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring); *see also*

*United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("The Guidelines . . . reflect

an ever more draconian approach to white collar crime, unsupported by any empirical data."). In

---

[10]     In the analogous circumstance of a reverse drug sting, where the government offers to sell a defendant a
greater quantity of a controlled substance to the defendant at a bargain price, the Second Circuit has described as
"unsettling" the government's "greater than usual ability to influence a defendant's ultimate Guidelines level and
sentence." *See United States v. Caban*, 173 F.3d 89, 93 (2d Cir. 1999). Although *Caban* was decided before *Booker*,
and the Second Circuit thus was compelled to affirm the sentence in that case, the court explained that the
Guidelines are not an appropriate measure of culpability in this sort of "reverse sting" scenario. *See id.* at 94 ("We
invite the Sentencing Commission's attention to some more comprehensive measure that would consider what
happens when a reverse sting involves a theft in which the government sets the bait (rather than a purchase in which
the government sets the price).").

fact, one recent study has found that "the data suggest that loss is an unsound measure of the seriousness of many offenses." Vera Inst. of Justice, *Drawn from Nowhere: A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 19 (2013); *see also United States v. Mohammed*, 315 F. Supp. 2d 354, 357 (S.D.N.Y. 2003) ("[A]cross a wide range of diverse types of schemes and thefts, the amount of the loss . . . may be a less accurate proxy for the seriousness of the offense."). The loss amount table's lack of foundation in empirical data or any other clearly articulated rationale suggests that a Guidelines sentence based on the loss table is not reasonable. As the Supreme Court noted in *Kimbrough v. United States*, where the Sentencing Commission is not "exercis[ing] its characteristic institutional role" by "tak[ing] account of 'empirical data and national experience,'" the Guidelines are much more likely to "yield[ ] a sentence 'greater than necessary to achieve § 3553(a)'s purposes.'" 552 U.S. 85, 109–10 (2007) (citation omitted).

Consistent with these precepts, the Second Circuit recently remanded a case for the district court to consider whether "the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). In that case, the loss table increased one defendant's offense level from six to eighteen – "a three-fold increase" – and the other from six to sixteen. *See id.* The Second Circuit noted the "unusualness" in the Guidelines' treatment of monetary offenses: "the Commission could have approached monetary offense quite differently. For example, it could have started the Guidelines calculation for fraud offenses by selecting a base level that realistically reflected the seriousness of the typical fraud offense and then permitted adjustments up or down to reflect especially large or small amounts of loss." *Id.* Instead, the Commission chose to use relatively low base levels, and to "let the amount of loss,

finely calibrated into sixteen categories, become the principal determinant of the adjusted offense

level and hence the corresponding sentencing range." *Id.* The "unusualness" of this approach, the

Second Circuit held, "is a circumstance that a sentencing court is entitled to consider," and the

combination of the low base offense level with a significant increase based on a loss

enhancement "entitles a sentencing judge to consider a non-Guidelines sentence." *Id.*

### B. Chuck's Personal History and Characteristics Warrant a Sentence of Probation Plus Community Service

Chuck's life has been defined by kindness, generosity, and compassion. We encourage

the Court to read each of the 72 letters submitted in Chuck's support. These letters, which come

from people who have known Chuck over the totality of his life, uniformly describe a "reliable,"

"honest," "trustworthy," and "loyal" person who has always been "eager to encourage, help, and

support others." Not only had Chuck never committed a crime before, he has been a model

citizen of his community. *See, e.g.*, Ex. A at 47 (S. Perkins Ltr.) ("Up to this recent setback he

has been a role model, mentor, good husband and responsible person."). As attested by the many

writers who were shocked and surprised to learn about the allegations against Chuck, the offense

was completely out of Chuck's character – an aberration in a truly exceptional life.

While acknowledging the seriousness of the offense conduct, we respectfully contend

that Chuck's compelling personal history and characteristics merit leniency in this case. *See*

*Khalid*, 2011 WL 6967933, at *2 (imposing a below-Guidelines sentence where defendant's

conduct is "out-of-keeping with [the defendant's] otherwise law-abiding and responsible life");

*Toback*, 2005 WL 992004 (same).

### C. The Nature and Circumstances of the Offense Do Not Mandate Prison Time

The nature and circumstances of the offense, while serious, are not unmitigated. *First*,

and most importantly, Chuck Person was not engaged in the charged offense – or any offense,

for that matter – until government cooperator Blazer appeared. Chuck did not come up with the idea to offset a loan by the value of player referrals. That idea was presented to him by Michel and Blazer, both of whom knew that Chuck desperately needed a loan. *Second*, Chuck acted out of financial desperation, and his lack of greed weighs strongly in favor of a below-Guidelines sentence. *See, e.g.*, *United States v. Thavaraja*, 740 F.3d 253, 260 (2d Cir. 2014) (affirming below-Guidelines sentence where defendant "was not motivated by 'power' or 'self-aggrandizement'"); *United States v. Connors*, No. 06 Cr. 189 (JRP), No. 2007 WL 29655612, at *4 (E.D. Pa. Oct. 9, 2007) (noting that "motivation is clearly a circumstance of [an] offense since it can both motivate and aggravate culpability" and finding that a defendant's "lack of greed" was a relevant consideration under the § 3553(a) factors). As described below in our discussion of the other NCAA prosecutions, Judge Kaplan considered precisely this factor – the presence of an "economic motive" but *not greed* – to be a mitigating factor that warrants a substantially below-Guidelines sentence. *See* Sentencing Tr. 38:6–7, *United States v. Gatto, et al.*, No. 17 Cr. 686 (LAK) (S.D.N.Y. Mar. 5, 2019).

### D.    The Need for Specific and General Deterrence Weighs in Favor of a Non-Custodial Sentence for Chuck

Chuck poses no risk of re-offense. Apart from any sentence this Court imposes, Chuck has already paid dearly for his crime. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (recognizing that "the need for further deterrence . . . is lessened" where "the conviction itself already visits substantial punishment on the defendant" (internal quotation marks omitted)). All Chuck knows is basketball, and his lifelong dream was to serve as the head coach of a basketball program, yet Chuck has been shunned by the basketball community. Not only that, Chuck has been severed from his beloved alma mater. Although Chuck's jersey continues to hang in the rafters, all other signs of his connection to the school have been removed, and plans

to erect a statue in his honor have been scrapped. Even harsher, Auburn employees – Chuck's former friends and colleagues – have been instructed not to speak with him. This shunning has been extraordinarily painful. "Chuck is a diehard Auburn fan, he bleeds orange and blue, and the loss of his relationship with the university and the coaching staff has been extremely devastating to him." Ex. A at 56–57 (V. Strickland Ltr.).

Chuck also missed the opportunity to participate in Auburn's first-ever appearance in the "Final Four" of the NCAA tournament this past spring – an unmatched success in the school's history (at least since Chuck's own Auburn team appeared in the Elite Eight). Had Chuck not taken payments from Blazer, he would have been able to share in the success of a team he helped to recruit and coach, and he also would have enjoyed being celebrated for his own Auburn playing career. Instead, Chuck has been pilloried by the press, which has covered this case continuously since September 2017. His greatest asset, his reputation, has been forever tainted by the badge of corruption; a quick Google search for "Chuck Person" confirms that Chuck's mistake has overshadowed all of his past achievements. As Leah describes, "[f]rom day 1 he has never been able to go even to the grocery store without whispers, stares and being looked at like a criminal," which caused Chuck to remain secluded "for almost a year because of the embarrassment he is constantly reminded of." Ex. A at 3 (Leah Person Ltr.).

This case has "knocked [Chuck] flat on his face" and "opened his eyes to his previous ways and mistakes." Ex. A at 2 (Leah Person Ltr.). Many other letters confirm that Chuck regrets his decision to accept payments in violation of the NCAA rules and will not make such a mistake again. Chuck recognizes that his failure to manage his money responsibly led him to make the worst decision of his entire life. He grew up poor and suddenly came into millions of dollars without a clue how to manage it. Chuck spent too freely, gave to anyone who asked, made

dreadful investment decisions, and turned to high interest loans as his financial circumstances deteriorated. Now in his fifties, Chuck recognizes that his inability to manage money made him tremendously vulnerable, and he is committed to make lasting change. Once his circumstances are settled, Chuck plans to work with a financial expert to help him restructure his debts and to develop a concrete and realistic plan to manage his money responsibly in the future.

Apart from his own demonstrated commitment to change, all relevant statistics confirm that Chuck is highly unlikely to recidivate. Specifically, the U.S. Sentencing Commission has found that first offenders with zero criminal history points, like Chuck, are statistically the least likely to re-offend. U.S. Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* (2017), *available at* https://www.ussc.gov/sites/default/ files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf. Moreover, "[r]ecidivism rates decline relatively consistently as age increases," and offenders of all types over the age of fifty, like Chuck, are the least likely to recidivate. *See* U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 12 (2004), *available at* https://www.ussc.gov/sites/default/files/pdf/ research-and-publications/research-publications/2004/200405_Recidivism_Criminal_ History.pdf.

Finally, a sentence of probation plus community service would sufficiently deter other college coaches who might contemplate making the same mistake that Chuck did. Given the serious consequences that Chuck has already suffered – all of which have been highly publicized – any college coach considering a bribe would unquestionably think twice.

E.      **A Sentence of Probation Plus Community Service Would Be Consistent with Sentences in Similar Cases**

A non-custodial sentence of probation plus community service would also avoid "unwarranted sentencing disparities" among other college basketball corruption cases. *See* 18 U.S.C. § 3553(a)(6). The "primary purpose" of this provision is "to reduce unwarranted sentence disparities nationwide," though the Second Circuit has approved a sentencing judge's "consideration of similarities and differences among co-defendants when imposing a sentence." *United States v. Wills*, 476 F.3d 103, 109–10 (2d Cir. 2007). Here, as Judge Kaplan noted in sentencing three individuals in a related case concerning payments to college basketball players through Adidas, the government's NCAA probe and the resulting charges were effectively without precedent. *See* Sentencing Tr. 35:1–4, *United States v. Gatto, et al.*, No. 17 Cr. 686 (LAK) (S.D.N.Y. Mar. 5, 2019). Thus, we focus our discussion of unwarranted sentencing disparities on the *Gatto* and *Evans* cases.

Every defendant to have been sentenced thus far in the college basketball cases, including each of the other assistant coaches, has received a sentence far below the low end of the applicable Guidelines range. In terms of the three other assistant coaches who committed the same offense as Chuck, no coach was sentenced to more than three months' imprisonment. Anthony Bland was sentenced to two years' probation despite a Guidelines range of 6-12 months. Emanuel "Book" Richardson and Lamont Evans each faced a Guidelines range of 18-24 months, but each was sentenced to three months' imprisonment – one-sixth of the low end of the applicable Guidelines range. A sentence of probation plus community service for Chuck – particularly in light of the circumstance of his offense, his extraordinary personal history and characteristics, and his demonstrated ability to give back to the community – would be fully consistent with the other sentences in the college basketball cases.

The only difference between Chuck and the other coaches (all of whom pleaded guilty and, like Chuck, accepted responsibility for their actions) is the loss amount. But, as discussed above, numerous courts have noted the inadequacy of loss amount as a measure of either the severity of the offense or an individual defendant's culpability. That is certainly true here, where all coaches, including Chuck, committed the same crime: all three violated the trust of their players and universities by taking money in exchange for agreements to steer players to certain financial advisors. The reason the loss amounts differ is because the government controlled the flow of funds. For instance, beginning in June 2017, Arizona Assistant Coach "Book" Richardson agreed to accept $5,000 per month in exchange for his agreement to refer players to Blazer. Richardson ultimately received $20,000 but "expected to continue to receive $5,000 monthly bribes going forward" had he not been arrested in September 2017. *See* Gov't Sentencing Br. at 8, *United States v. Richardson*, No. 17 Cr. 684 (ER) (S.D.N.Y. May 31, 2019), ECF No. 249. For this reason alone, Richardson's Guidelines range was lower than Chuck's. Given that the government controlled the amount of payments for each defendant, loss amount is not an appropriate proxy for each defendant's individual level of culpability. *See Caban*, 173 F.3d at 93 ("It is unsettling that in this type of reverse sting, the government has a greater than usual ability to influence a defendant's ultimate Guidelines level and sentence.").

The sentences in *Gatto* also support a non-custodial sentence of Chuck Person. The defendants in *Gatto* were convicted at trial of having funneled hundreds of thousands of dollars to numerous college players in order to recruit those players to Adidas-sponsored universities. *See generally* Gov't Sentencing Br., *United States v. Gatto, et al.*, No. 17 Cr. 686 (LAK) (S.D.N.Y. Feb. 26, 2019), ECF No. 288 (describing offense conduct). The offense conduct was repeated over the course of years as a general business practice. And unlike Chuck, the

defendants in that case did not accept responsibility for their actions by pleading guilty. For their

respective roles in the offenses, the defendants' Sentencing Guidelines ranges were higher than

Chuck's: 46-57 months for James Gatto, 30-37 months for Merl Code, and 30-37 months for

Christian Dawkins. Despite the Guidelines ranges, Judge Kaplan imposed more lenient sentences

that reflected the novel nature of crimes based on violating the NCAA rules and the defendants'

personal characteristics: Gatto was sentenced to nine months' imprisonment, and Code and

Dawkins were each sentenced to six months' imprisonment. *See* Sentencing Tr. 39:5–8, *United*

*States v. Gatto, et al.*, No. 17 Cr. 686 (LAK) (S.D.N.Y. Mar. 5, 2019) ("If this were not the first

prosecution of its kind, if the characteristics of these defendants were different, and if other

things were different, I might take a very different view of the appropriate sentences."). Because

the conduct in the *Gatto* case was pervasive, involved substantially more money, and did not

occur at the behest of a government cooperator, and because the defendants in *Gatto* did not

accept responsibility for their actions by pleading guilty like Chuck did, we respectfully contend

that Chuck should receive a sentence substantially below the *Gatto* sentences to avoid

unwarranted sentencing disparities across similar cases.[11]

###### F.     Probation Plus 200 Hours of Community Service in the Atlanta Area Would Allow Chuck to Make Amends

Finally, in crafting a just sentence under the § 3553(a) factors, the Court may impose a

term of probation along with a term of "work in community service as directed by the court." 18

---

[11]     A non-custodial sentence in this case would also be consistent with the only sentence imposed thus far in the college admissions bribery cases. Former Stanford University sailing coach John Vandemoer accepted $610,000 in bribes, which he funneled to the school's sailing program, in exchange for designating certain applicants as recruits for the Stanford sailing team. Vandemoer's Guidelines range was 33-41 months (higher than Chuck's), but the court imposed a below-Guidelines sentence of six-months home confinement. *See United States v. Vandemoer*, No. 19 Cr. 10079 (RWZ) (D. Mass.).

U.S.C. § 3563(b)(12). A substantial term of community service, along with the other standard conditions of probation, would be an appropriate and just punishment in this case.

Specifically, we respectfully propose that Chuck be required to perform a substantial period of community service – 200 hours of community service over the course of one year (or approximately four hours per week) – in lieu of imprisonment. Community service would serve as both a serious punishment and a productive means to deploy Chuck's talents in his community. It would allow Chuck an opportunity to make a meaningful contribution in the lives of young players and their families, and to atone for his mistake.

Should the Court be willing to impose such a sentence, David Thomas, Founder and Executive Director of George Excel Youth Development, has agreed to work with the Probation Department in supervising Chuck's community service obligation. *See* Ex. A at 94–95 (D. Thomas Ltr.). Georgia Excel Youth Development is a non-profit organization that serves underprivileged youth in the Atlanta area. Its mission is "to promote life and leadership skills through the game of basketball and encourage our youth to participate in local and national competitions." The organization provides not only a structure for underprivileged children through basketball training, but also life skills training like financial literacy courses. The young people served by Georgia Excel Youth Development would benefit greatly from Chuck's demonstrated abilities as a basketball coach and mentor, which would otherwise go to waste in a prison cell. Particularly given the nature of Chuck's crime, mandatory community service in the form of basketball coaching and mentoring for underprivileged youth would also serve as a fitting punishment in this case.

## **CONCLUSION**

For the foregoing reasons, Defendant Chuck Person respectfully submits that a sentence of probation, including a requirement of 200 hours of community service, would accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Dated:  New York, New York
            July 2, 2019

                                              Respectfully submitted,

                                              */s/ Theresa Trzaskoma*

                                              SHER TREMONTE LLP
                                              Michael Tremonte
                                              Theresa Trzaskoma
                                              Michael W. Gibaldi
                                              90 Broad Street, 23rd Floor
                                              New York, New York 10004
                                              (212) 202-2600
                                              ttrzaskoma@shertremonte.com

                                              *Counsel for Chuck Person*