UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA          :

   -v.-                                                    :          17 Cr. 683 (LAP)

CHUCK CONNORS PERSON,          :

                       Defendant.         :

------------------------------------------------------------x


# THE GOVERNMENT'S SENTENCING MEMORANDUM


                                                      GEOFFREY S. BERMAN
                                                      United States Attorney
                                                      Southern District of New York


Robert L. Boone
Aline R. Flodr
Noah Solowiejczyk
Eli J. Mark
Assistant United States Attorneys


- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

UNITED STATES OF AMERICA                  :

   -*v*.-                                              :        S1 17 Cr. 683 (LAP)

CHUCK CONNORS PERSON,                     :

                       Defendant.              :

---------------------------------------------------------------x

## PRELIMINARY STATEMENT

The Government writes in advance of the sentencing of defendant Chuck Connors Person, which is currently scheduled for July 17, 2019, at 12:00 p.m., and in response to the defendant's sentencing submission dated July 2, 2019. On March 19, 2019, the defendant pled guilty to conspiracy to commit federal funds bribery in violation of Title 18, United States Code, Section 371. The defendant pled guilty pursuant to a plea agreement, which contained a stipulated Guidelines range of 24 to 30 months' imprisonment. For the reasons discussed below, the Government respectfully submits that a sentence within that applicable Guidelines range is sufficient but not greater than necessary to promote the legitimate ends of sentencing.

## BACKGROUND

**A. The Defendant's Offense Conduct**

As detailed in the Presentence Investigation Report, the Complaint, and the Indictment, Person abused his position as a college basketball coach at Auburn University by accepting bribes from certain athlete advisors in exchange for agreeing to steer players he coached to retain the services of those advisors.[1] Person participated in the charged scheme from in or about

---

[1] Attached as an exhibit is a Victim Impact Statement submitted by Auburn University.

September 2016 to in or about September 2017, and received approximately $91,500 in bribes during that time period.  In exchange for the bribe money, and consistent with the corrupt agreement described above, Person in fact attempted to steer players and their parents to the bribe payors.  In particular, Person took the following specific steps:  (1) Person arranged for his co-defendant, Rashan Michel, the founder and operator of a clothing company that had a client base that consisted primarily of professional athletes, and the Government's cooperating witness, Martin Blazer,[2] posing as a financial advisor in the scheme, to meet with a basketball player from Auburn University ("Player-1"), in connection with Person's attempt to influence that player to retain the services of Michel and Blazer; (2) Person arranged for Blazer to meet the mother and stepfather of Player-1 ("Mother-1" and "Stepfather-1") in connection with Person's attempts to influence Player-1 to retain Blazer; (3) Person arranged for Blazer to meet another basketball player from Auburn ("Player-2"), and his mother ("Mother-2"), in an attempt to influence Player-2 to retain the services of Blazer; and (4) Person encouraged and facilitated the payment of bribes by Blazer to the parents of Player-1 and Player-2 .

      Person's scheme began in the fall of 2016, at which time he was the associate head coach of Auburn University's men's basketball team.  On or about November 29, 2016 (the "November 29th meeting"), Person, Michel, and Blazer, met at a restaurant near the campus of Auburn University.  (Compl. ¶ 36.)   The purpose of the meeting was for Michel, an acquaintance of Person's, to introduce Person to Blazer so Blazer could begin making bribe payments to Person.  (*Id*.)  Prior to the meeting, Michel had informed Blazer that he knew a college basketball coach, later identified as Person, who was in need of a $60,000 loan and that in exchange for the loan, that coach could "give us 2 or 3 kids that's all coming out of his program."  (Compl. ¶ 33(b).)

---

[2] Referred to in the Complaint as CW-1.

Michel and Blazer discussed forgiving the purported loan by allowing Person to "offset" the amount he owed to Blazer each time Person successfully directed a student-athlete to retain Blazer's services as a financial advisor and business manager, and Michel's services a clothier. (Compl. ¶ 34.)   At the November 29th meeting, Michel explained to Person the general parameters of the loan, including that the purported loan payments would be "offset" by the basketball players that Person steered to them.  (Compl. ¶ 36(c).)  Person confirmed that he agreed with the arrangement, stating he was "good with it."  (*Id*.)  At the conclusion of the November 29th meeting, Person asked if he could receive $10,000 that day, rather than an initial payment of $5,000 that had been previously discussed by Michel and Blazer.  Michel provided Person with an envelope containing $5,000,[3] and Blazer agreed to wire an additional $5,000 to Person's bank account.  (Compl. ¶¶ 36(d) and 37.)

Almost immediately following the November 29th meeting, Person began touting his ability to steer players to Blazer in exchange for cash.  Indeed, just one day after the November 29th meeting, Person talked to Blazer on a recorded telephone call about setting up a meeting between Blazer and the mother of Player-1.  (Compl. ¶ 38.)  Person told Blazer that he met with Player-1 every week at his mother's house, and that Player-1 "listens to one person.  He listens to one person . . . That's me, yep."  (*Id*.)  Person suggested that Blazer meet with Player-1's mother after an upcoming game in New York City.  (*Id*.)  Person then confirmed that Blazer was going to pay him the next installment of the bribe payment on the agreed upon schedule, asking "you're gonna – you're gonna give me 10 today, and then 15, 15, 10, correct?"  (*Id*.)

---

[3] Prior to the meeting, Blazer had provided the envelope containing $5,000 in cash to Michel at the direction of law enforcement.

Shortly thereafter, on December 1, 2016, Blazer informed Person that he had sent Person a wire transfer of $5,000, and that he could give Person another $5,000 at their next meeting. (Compl. ¶ 40.) The next day, December 2, 2016, Person continued discussing setting up a meeting between Blazer and the mother of Player-1, and bragged about the quality of players he could steer to Blazer in exchange for bribe payments. In a recorded call, Person stated, "I got some great great, I mean, great great ball players. Auburn's never seen these players since um, Charles Barkley, myself, and Chris Morris. This is unbelievable . . . . I'd like to get these players to, uh, get to you, and then if, if I can supplement myself and be able to stay at Auburn, and make it work, then I can stay and not go looking somewhere else . . . . Then that'll be good – that'll be good for both of us." (Compl. ¶ 41(c).) Person went on to explain how his previous experience as a professional basketball coach in the National Basketball Association ("NBA") lends him a certain level of credibility with his players, saying "yeah, really, when you've coached Kobe Bryant, worked with Phil Jackson, it goes a long ways." (*Id.*)

Ultimately, Person did set up meetings between Blazer and his players and used his influence to steer those players to retain Blazer. The first player Person introduced to Blazer was Player-1. On December 12, 2016, Person, Blazer, Michel, and Player-1 met in a hotel room in Manhattan, New York. (Compl. ¶ 42.) Auburn's basketball team was in New York City that day to play a basketball game at Madison Square Garden. (*Id.*) During the meeting, Person explained to Blazer that he had told Player-1 and his mother that Blazer was a financial advisor. (Compl. ¶ 42(a).) Person then told Player-1 that he and Blazer would ultimately "sit down with your mom and we'll come up with something. We can help you out." (*Id.*) Person concluded their discussion by cautioning Player-1 against telling others about what they discussed and the fact that Player-1 would be receiving money from Blazer. Person stated, "most important part is

4

that you . . . don't say nothing to anybody . . . that's very important cause this is a violation . . . of rules, but this is how the NBA players get it done, they get early relationships, and they form partnerships . . ." (Compl. ¶ 42(c).)  During the December 12, 2016, meeting, outside the presence of Player-1, Blazer gave Person approximately $15,000 in cash at the direction of law enforcement.  (Compl. ¶ 42(d).)

Later, on December 18, 2016, Person introduced Mother-1 and Stepfather-1 to Blazer in connection with steering Player-1 to retain the services of Blazer. (Compl. ¶ 45.)  Person, Mother-1, Stepfather-1, and Blazer met at Person's home in Alabama.  (*Id.*)  During the meeting, which was recorded by law enforcement, Person introduced Blazer to Mother-1, and discussed with Mother-1, in sum and substance, Blazer becoming Player-1's financial advisor.  (*Id.*)  Person told Mother-1 and Stepfather-1 that Player-1 had already met with Blazer in New York. (*Id.*)  Person assured Mother-1 and Stepfather-1 that they did not "have to sign anything, your word is good enough for him, and your word is good enough for me," and further explained that "when [Player-1] get[s] drafted in June then they'll make a formal signing to be a financial advisor . . . and uh you shouldn't work with more than one financial agent." (*Id.*)  Person also brought up the topic of payments, and told Mother-1 and Stepfather-1 that Blazer would pay them "a few," over the next four months, which was the remainder of the basketball season. (Compl. ¶ 46.)  Person also told Mother-1 and Stepfather-1 that Blazer would pay them $1,000 in cash that day, which payment Blazer provided at the meeting.  (*Id.*)

The second player Person introduced to Blazer was Player-2.  On January 18, 2017, Person, Player-2, Mother-2, and Blazer met at Person's home in Alabama.  (Compl. ¶ 51.) During the meeting, which was recorded by law enforcement, Person introduced Blazer to Player-2 and Mother-2 and told them that Blazer, along with another individual who was a

5

financial advisor ("Advisor-1"), would become Player-2's business manager and financial advisor when Player-2 entered the NBA. (*Id.*)  Person initially intended for Advisor-1 and Blazer to jointly represent Player-2, so that Person could receive money from both individuals in exchange for directing Player-2 to retain their services.[4]  (*Id.*)  At the meeting, Person stated that the type of money that Player-2 would make in the NBA would be "unreal."  (Compl. ¶ 51(a).) Person informed Mother-2 and Player-2 that, once he made the connection among Blazer, Advisor-1, Player-2 and Mother-2, he would be "out of it.  That's between [you], your business, what you're doing and how much you need help going forward with what you need."  (*Id.*)  At the meeting, outside the presence of Mother-2 and Player-2, Blazer provided Person with a payment of $10,000 cash.  (Compl. ¶ 51(b).)

During the course of the charged scheme, Person received approximately $91,500 in total from Blazer.  (Compl. ¶ 56.)  Of the total amount he received, Person claimed to Blazer to have given approximately $18,500 to the families of Player-1 and Player-2 to encourage them further to retain the services of Blazer.  (*Id.*)  Specifically, Person claimed to have given approximately $11,000 to Mother-1 and approximately $7,500 to Mother-2.  (*Id.*)

**The Charges and The Defendant's Guilty Plea**

Indictment S1 17 Cr. 683 (LAP) charged Person and Michel in multiple counts with participation in the bribery scheme described above.  On March 19, 2019, the defendant pleaded guilty to Count One of the Indictment, which charged conspiracy to commit bribery, in violation of 18 U.S.C. § 371, and he also agreed to forfeiture of $91,500.

---

[4] Indeed, at least as early as in or about January 2017, Person began discussing with Advisor-1 facilitating a meeting between Advisor-1 and Mother-2. (Compl. ¶ 50.)  A meeting involving Person, Advsor-1, an associate of Advisor-1's, and Mother-2 did occur.  (*Id.*)  However, Advisor-1 ultimately informed Person that he did not want to make payments to Mother-2 to ensure that Player-2 would retain Advisor-1's services.

6

### B. The Applicable Guidelines

As set forth in the parties' plea agreement and by the Probation Office, the base offense level is 12; a two level increase is warranted pursuant to U.S.S.G. § 2C1.1(b)(1) because the offense involved more than one bribe; a six-level increase is warranted pursuant to § 2C1.1(b)(2) because the value of the payments made to Person exceeded $40,000 but was less than $95,000; and a three-level decrease is warranted pursuant to U.S.S.G. § 3E1.1(a) and (b) due to the defendant's acceptance of responsibility, resulting in a total offense level of 17. (PSR ¶ 66-77). The defendant has zero criminal history points and is in Criminal History Category I. (PSR ¶ 80). Accordingly, the applicable Guidelines range is 24 to 30 months' imprisonment. (PSR ¶ 134).

The Probation Department has recommended that Person be sentenced to Time Served.

### DISCUSSION

As the Court is aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id*. at 49. After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to adequately deter criminal conduct and promote respect for the law, and the need to protect the public from further crimes of the defendant. *Id*. at 50 & n.6.

Here, a Guidelines sentence is appropriate and would meet the objectives set forth in 18 U.S.C. § 3553(a), given (1) the nature and circumstances of the offense and the history and

7

characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and (B) to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(1), (2)(A)-(B).

    A. <u>The Nature and Seriousness of the Offense</u>

With respect to the nature and circumstances of the offense, Person's conduct was serious. At its core, it involved a blatant disregard for the trust placed in Person by his employer, Auburn University, and his players. For tens of thousands of dollars, Person was willing to take actions that were in direct conflict with his duties as an NCAA Division 1 men's basketball coach; that could and still may subject his university to significant penalties; and, most importantly, that reflected a wanton disregard for the well-being of the very student-athletes he was charged with supervising. Indeed, in exchange for the bribe money, Person was willing to instruct his players to hire a financial advisor who had been publicly accused by the United States Securities and Exchange Commission of misappropriating his clients' money. (*See* Compl. ¶ 20 n.2.) Receiving any single bribe payment in itself is serious and merits punishment. In this case, Person received multiple bribes, over time, as part of an ongoing corrupt arrangement in which he was expected to – and manifested a clear willingness to – pressure his players to retain unsavory advisors. That conduct, and the cavalier ease with which Person engaged in it – merits serious punishment.

In an effort to downplay the seriousness of Person's conduct, Person spends a substantial portion of his sentencing submission minimizing his culpability and suggesting that others (namely, the Government) are more at fault for his actions. For example, Person claims, among other things, that (1) Blazer was the one who proposed loaning Person money in exchange for

8

Person referring Auburn basketball players to retain Blazer's services (Def.'s Br. 3); (2) Blazer knew at the time that Person desperately needed a loan (*id.* at. 29); (3) Person was likely going to pay some, if not all, of the loan money back to Blazer (*id.* at. 25); (4) Person did not take the bribe money out of greed, but because he needed it to stave off creditors (*id.* at. 25); (5) Person ultimately used all of the bribe money to pay off creditors (*id.* at 19); and (6) Person's loss amount is high only because the Government chose to give Person a high amount of bribe money (*id.* at. 33).

Person's factual assertions are false. First, as the Complaint makes clear, the idea of loaning Person money in exchange for Person referring Auburn basketball players to retain Blazer's services originated from Person's co-defendant, Rashan Michel. Indeed, prior to Michel introducing Blazer to Person at the November 29th meeting, Blazer had never spoken to Person before. As stated earlier, just prior to the November 29th meeting, Michel informed Blazer that he knew a college basketball coach, later identified as Person, who was in need of a $60,000 loan and that in exchange for the loan, that coach could "give us 2 or 3 kids that's all coming out of his program." (Compl. ¶ 33(b).) Moreover, given that Blazer did not even know who Person was prior to Michel informing Blazer about him, Blazer certainly did not have firsthand knowledge regarding whether Person "desperately needed a loan." (Def.'s Br. 29.) Accordingly, any claim that the Government sought to ensnare Person in a criminal scheme knowing that he was in a precarious financial situation is false.

Second, it was abundantly clear to Person that the purported loan payments he received would be "offset" by the student athletes that Person steered to Blazer and Michel such that Person would likely never have to repay it. As stated earlier, at the November 29th meeting, Michel explained to Person the general parameters of the loan, including that the purported loan

9

payments would be "offset" by the basketball players that Person steered to Michel and Blazer. (Compl. ¶ 36(c).)  As detailed in the Complaint, when Person, Michel, and Blazer discussed how the "offset" would work, Person responded, "so we make this go away . . . quickly?"  (*Id*.)  Michel elaborated on the proposal, noting that "what we gonna do is, every time you send me a kid, I'm gonna offset some of that money I gave you . . . . You good with that?"  (*Id*.)  Person then confirmed to Michel and Blazer that he was "good with it."  (*Id*.)  And, as detailed extensively above, Person then took real steps to in fact steer players to Blazer with the expectation that, by so doing, Person would be "offsetting" at least portions of the cash advance.

In Person's sentencing submission, Person attempts to sow doubt as to whether he understood how the "offset" would work in hopes of lessening his culpability.  With little if any factual support, Person claims that his steering of players to Blazer in the manner in which he did with respect to Player-1 and Player-2 was not enough to "offset" the purported loan.  (*See* Def.'s Br. 25.)  Instead, Person claims, "the amount of loan forgiveness . . . was going to depend on whether and when any of the players entered the NBA and retained Blazer to manage their money."  (*Id*.)   To be clear, as a legal matter, none of this matters.  Person does not dispute (as he cannot) that he entered into a conspiracy to accept money in exchange for agreeing to steer Auburn players to retain the services of certain advisors.  Whether Person would ultimately have to pay the purported loan back, and if so, under what conditions, is of no moment.

Nevertheless, Person's self-serving assertion lacks any support.  To support Person's argument that he may have been obligated to pay some of the loan money back, Person cites to a phone call that was intercepted pursuant to a wiretap on Michel's phone on May 19, 2017, in which Michel tells Blazer, "Ultimately, at the end of the day, Chuck's gotta pay that money back . . . ."  (Def.'s Br. 18, n.6 and 25.)   However, Person conveniently leaves out the remainder of

10

Michel's statement on the call, in which Michel makes clear that Person did not have to pay the loan back if he steered players to Michel and Blazer. Michel stated, "Ultimately, at the end of the day, Chuck's gotta pay that money back *or he gotta do what he gotta do . . . .*" (emphasis added). On this call, Michel and Blazer were discussing paying a member of the athletics department of a NCAA Division I basketball program (referred to in the Complaint as, "Staff Member-1"), to influence players at Staff Member-1's school to retain Blazer. In discussing the merits of giving bribe payments to Staff Member-1, Michel references the arrangement he, Blazer, and Person have and the virtue of that arrangement, that Person is obligated to either steer players to them or give them the loan money back. As such, any argument that Person did not understand the true nature of his arrangement with Michel and Blazer is without merit.[5]

Third, irrespective of how Person used the bribe money he received, his taking of the bribe money was motivated by greed. Person argues that "[he] was never motivated by greed" but was "driven by financial desperation," and that he "used every penny to repay his creditors." (Def.'s Br. 19.) However, when Person joined the charged conspiracy, he was making a base salary of approximately $250,000 from Auburn University. Despite making that comfortable salary, Person put himself in a position where he needed more and more money, ultimately resulting in his participation in the charged conduct. Person supplemented that legitimate income by taking over $90,000 in bribes in less than a year. Person's purported use of his bribe money to pay off his own personal debts does not make the bribe scheme any less the product of greed. Indeed, by Person's own admission, he chose to accumulate massive amounts of debt by repeatedly acquiring thousands of dollars in personal loans. (*See* Def's Br. 16, 17.) (Person

---

[5] Indeed, despite Person's suggestion that he intended to pay some, if not all, of the purported loan money back, he never paid any of the money back.

acquired nearly $400,000 in loans in approximately 5 years). He then spent that money however he saw fit. Person's purported use of bribe money to pay back expenses he chose to incur does not somehow make his taking of bribes less nefarious.

In any event, Person's claim that he "used every penny to repay his creditors" is just false. As stated earlier, Person himself admitted to Blazer to having given approximately $18,500 of the $91,500 he received to the families of Player-1 and Player-2. (Compl. ¶ 56.) That fact alone defeats Person's claim that the $91,500 he received in bribe money was used to pay "over $93,000 to various creditors." (Def.'s Br. 19.) In addition, Person's bank records clearly show that after receiving bribe payments Person spent money on various things unrelated to his debts. For example, on January 12, 2017, Person received a wire transfer in the amount of $11,500 from Blazer. Within two weeks of receiving that money, Person withdrew approximately $2,000 in cash and spent approximately $350 at restaurants, approximately $350 at convenient stores, approximately $280 at an Auburn sports tickets office, and approximately $200 at gas stations, among other things.

Finally, Person's loss amount is not unfairly higher than those of the defendant coaches in *United States* v. *Evans*, et al., 17 Cr. 684 (ER), a separate but related case involving a similar bribery scheme. Person complains that Person's loss amount is higher than those of the defendant coaches in *Evans* because the Government chose to pay Person more bribe money and allowed Person's scheme to last longer than those of the defendant coaches in *Evans*. (Def.'s Br. 25, 26.) By way of example, Person notes that one of the defendant coaches in *Evans* was scheduled to be paid $5,000 a month in bribe money, but was arrested after having only received $20,000 in bribes (four months' worth of payments). (Def.'s Br. 26.) Person's argument is baseless.

Person received more bribe money than the defendant coaches in *Evans* because he asked for more money, more quickly. As stated at the outset, Person's scheme began with him asking for a bribe in the amount of $60,000. That request automatically placed Person in the loss range he ultimately stipulated to in his plea agreement. Person also wanted to get paid quickly. Indeed, at Person's very first meeting with Blazer, the November 29th meeting, Person asked to get paid $10,000 that day, instead of the agreed-upon $5,000 initial payment. (Compl. ¶ 36(d).)[6] The very next day, Person reached out to Blazer to confirm the next installment of payments, asking "you're gonna – you're gonna give me 10 today, and then 15, 15, 10, correct?" (Compl. ¶ 38.) Person ultimately asked for even more money, bringing the total amount of bribe money he received to $91,500 (although that had no effect on his Guidelines range). Ultimately, Person reached the minimum loss amount threshold for his Guidelines range, $40,000, within approximately the first 30 days of his conspiracy. Accordingly, it was Person's insatiable greed that resulted in his Guidelines range, not the actions of the Government.

In light of Person's insatiable greed, and the actions he took in exchange for the bribe money, Person should not receive a sentence identical to those of the coach defendants in *Evans*. In *Evans*, defendant coach Anthony Bland, who accepted a bribe of approximately $4,100, received a sentence of two years' probation, defendant Emmanuel Richardson, who accepted a bribe of approximately $20,000, received a sentence of three months' imprisonment, and defendant Lamont Evans, who accepted a bribe of approximately $22,000, also received a sentence of three months' imprisonment. As stated earlier, Person accepted bribes totaling approximately $91,500. As such, Person's bribe amount is more than quadruple that of the

---

[6] Blazer paid Person $5,000 that day, through Michel, and agreed to wire an additional $5,000 to Person. (Compl. ¶ 36(d).)

highest bribe amount a defendant coach in *Evans* received.  That difference alone favors a sentence different from those received by the defendant coaches in *Evans*.  In addition, what Person did in exchange for the bribe money also differentiates Person from the defendant coaches in *Evans*.  Unlike any of the defendant coaches in *Evans*, Person introduced two players he currently coached, and their family members, to Blazer and/or an advisor the Government alleged was a part of one of the charged conspiracies.  Put differently, of the defendant coaches, Person exhibited the most effort to steer players to certain advisors in exchange for cash.  Accordingly, Person should not receive a sentence identical to any of the coach defendants in *Evans*.

B.  Deterrence

With respect to deterrence, in imposing a Guidelines sentence, the Court will send a clear message that taking bribes as a college basketball coach of a university receiving federal funding is not only wrong, but will carry significant consequences.  The series of cases, this one among them, charged by the Government in 2017 makes clear that such a message is necessary if the justice system is to have any impact on corruption in college athletics.  And it is particularly necessary to deter coaches from taking bribes to sell out their players.  The non-incarceratory sentence sought by the defendant would have a substantially diminished deterrent impact on an industry in need of one.

In addition, specific deterrence is also important given that Person has proven that his participation in the charged scheme was not an aberration from his character.  As explained earlier and in the Complaint, during the course of the charged scheme, Person attempted to enter into another bribery scheme absent any involvement from the Government.

At least as early as in or about January 2017, Person began discussing with another financial advisor located in Alabama ("Advisor-1") facilitating a meeting between Advisor-1 and Mother-2.  (Compl. ¶ 50.)  A meeting ultimately did occur involving Person, Advisor-1, an associate of Advisor-1, and Mother-2.  (*Id*.)  Person's intention in arranging for Mother-2 and Advisor-1 to meet was to facilitate Advisor-1 and Blazer jointly representing Player-2, so that Person could receive money from both individuals in exchange for directing Player-2 to retain their services.  (Compl. ¶ 51.)  Ultimately, Advisor-1 informed Person that he did not want to make payments to Mother-2 to ensure that Player-2 would retain Advisor-1's services, in part, because such payments were "never going to be enough" and he "won't be able to stop."  (Compl. ¶ 52.)  Subsequently, Person told Mother-2, who Person had previously encouraged to use both Advisor-1 and Blazer, to "just go and use [Blazer]."  (Compl. ¶ 53(a).)  When Mother-2 questioned Person about cutting out Advisor-1, Person clarified that he was only "talking about just for what you need monthly . . . . Just use [Blazer] until [Player-2] leaves school."  (*Id*.)  Mother-2 then inquired if accepting payments would mean that "I'm committing to going with him . . . right?," which Person stated was true.  (Compl ¶ 53(b).)

Given Person's attempt to essentially double-dip by participating in two different but overlapping conspiracies, it is clear that something more than community service is required to adequately deter him from engaging in criminal conduct.  For the reasons stated earlier, something more than community service is also required to adequately deter others from committing conduct similar to that of the defendant.  The Government submits that a Guidelines sentence would be sufficient but not greater than necessary to create such a deterrent effect.

## **CONCLUSION**

For the aforementioned reasons, the Government respectfully submits that a Guidelines sentence is appropriate in this case and sufficient but not greater than necessary to promote the legitimate ends of sentencing.

Dated: New York, New York
July 11, 2019

                          Respectfully submitted,

                          GEOFFREY S. BERMAN
                          United States Attorney

By:   s/ Robert L. Boone
       Robert L. Boone
       Aline R. Flodr
       Noah Solowiejczyk
       Eli J. Mark
       Assistant United States Attorneys
       (212) 637-2208/1110/2473/2431